OPINION
{¶ 1} Appellants, Connie E. and William R., separately appeal the decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of their son, C.E., to the Butler County Children Services Board (the "Agency").
 {¶ 2} C.E. was born prematurely on January 16, 2004 at 33 weeks of gestation. At the time of his birth, the whereabouts of his father William were unknown. As explained later in this decision, although they were not apparent at birth, C.E. has several developmental delays and requires a great deal of care and therapy.
 {¶ 3} Four days after C.E.'s birth, the Agency received a referral that Connie was immature, had the mind of an eight year old, and may not have basic supplies to care for her son. Connie was also observed to engage in peculiar behavior such as carrying a toy ambulance wrapped in a blanket. After the Agency received further information that Connie had difficulty feeding and clothing C.E. and changing his diaper, and that she needed constant supervision with constant prompting to meet the child's basic needs, C.E., then nine days old, was removed from his mother and placed in a foster home. He has been in the same foster home ever since, is bonded with his foster parents, and is doing very well. His foster family wishes to adopt him.
 {¶ 4} In March 2004, C.E. was adjudicated dependent. The parties stipulated that C.E. was Connie's first child, that she needed and wanted to learn appropriate parenting skills to successfully parent her son, and that she wanted a new living environment in which to bring her son. A case plan was put into place. Connie was required to obtain and maintain reliable and stable housing and transportation, pay monthly bills on time, undergo a psychological evaluation, and participate in an in-home parenting program. William was added to the case plan in January 2005 after his paternity was established in October 2004. William was required to obtain and maintain reliable and stable housing and transportation, pay monthly bills on time, and participate in an in-home parenting program, and was asked to undergo a psychological evaluation. The following evidence was adduced at a series of hearings held in September and October 2005 on the Agency's motion for permanent custody:
 {¶ 5} Connie completed her psychological evaluation in April 2004 with Dr. William Moore, a clinical psychologist. The evaluation revealed that Connie came from a "chaotic and deprived environment with several child protection involvement episodes with [her mother (the `grandmother')]," was obsessed with fire, and was psychiatrically hospitalized in 1998 after a suicide attempt following the death of her father. Connie reported that sometimes her temper explodes and she completely loses control. Describing Connie as an odd and peculiar individual in her appearance, verbalization, and behaviors, Dr. Moore testified that the evaluation "suggested some unusual kinds of thinking and behaviors that may be incompatible with effective parenting." Dr. Moore further testified that Connie appeared to have either Williams Syndrome, a genetic disorder, or schizotypal personality disorder.[1] Because both disorders are refractory to treatment, he could not suggest a treatment for Connie. Based on the foregoing, Dr. Moore concluded "it cannot be suggested that this individual can safely parent a child at this time in her life." Genetic testing performed on Connie later ruled out Williams Syndrome.
 {¶ 6} With regard to transportation, Connie bought a van which she maintains. Because Connie does not drive, the van is driven by the grandmother. William has never been seen driving the van. With regard to housing, appellants have never lived on their own. Unmarried, they are currently living in a trailer with the grandmother and Connie's sister (the "aunt"). During the proceedings, appellants moved four different times, living once with friends when they could not keep up with their monthly expenses.
 {¶ 7} Karen Lavender, a parent educator with the Development of Living Skills ("DLS") Program, provided the in-home parenting program. The first DLS program was initiated in July 2004 but discontinued in November 2004 after appellants no longer lived in their own home. During that first program, Connie attended 24 out of 27 lessons while William attended about 14 of them. The program was reinstituted in early July 2005. Connie attended six lessons while William attended five. Lavender testified that Connie loves learning and that parenting lessons were her favorite. Lavender testified that during the first DLS program, appellants were at one time without gas because they had failed to pay a large utility bill. Yet, at the same time, they were paying for a satellite TV for the grandmother. Connie was unwilling to forego the satellite TV to have money to pay off the gas bill. Instead, Connie hoped to receive assistance in the fall from the HEAP Program and the Family Resource Center. Although they had enough money on paper to pay their bills, appellants eventually moved in with friends because they could not pay their bills.
 {¶ 8} The first DLS program focused on housekeeping, safety, and money management issues. The program also involved parenting lessons. Although they understood the lessons and knew what needed to be done, appellants were unable to do housekeeping on a regular basis: every week, one area was clean while another was worse than the week before. According to Lavender, appellants would make progress but then would fall back, and she would have to constantly go over the same material. Lavender testified that Connie typically understood the parenting lessons and knew what she had to do. Yet, she was more often than not unable to implement what she had learned. In fact, Connie's parenting "progress was really, really slow." Lavender testified that although appellants completed the lessons during the first DLS program, there was no real progress with regard to housekeeping and safety. While Connie had made lots of progress with regard to parenting, there were still a lot of concerns, especially in light of C.E.'s delays.
 {¶ 9} By the time the second DLS program started, Connie had given birth to a daughter (the daughter was born in March 2005 and was placed in the same foster family). Lavender testified that during visitation, William plays very appropriately with C.E., and that he always asks very appropriate questions. Nonetheless, although William has adequate parenting skills, more work would be needed if he were to be the primary caregiver. By contrast, Connie has trouble parenting two children at the same time and does not interact much with C.E., at times almost abandoning him in favor of her daughter. C.E. responds to and smiles at Connie. Lavender testified that Connie has a very short attention span and was unable to focus during a recent parenting lesson. Although Connie knows what a good parent is and loves her son, housekeeping, safety, and management issues remain. Lavender also testified that appellants' new home was in a much better condition than previous residences and not as cluttered. Yet, a lot of work still needed to be done and some safety issues remained. Lavender is confident that appellants know what they need to do with regard to proper nutrition and housekeeping.
 {¶ 10} The Agency recommended that William undergo a psychological evaluation. The Agency explained to William the reasons behind the recommendation. The initial referral was made in October 2004 with Dr. Moore. William agreed to the evaluation but rescheduled the first two appointments. He then asked to be evaluated by a doctor other than Dr. Moore. Although the Agency granted his request, he subsequently missed the next two or three appointments. Ultimately, William refused to be evaluated. As a result, the Agency was unable to determine which services, if any, were needed to help William reunify with C.E., and no services were provided (other than his participation in the DLS programs).
 {¶ 11} Appellants were granted supervised visitation, twice a week, two hours each. While Connie's visitation started in April 2004, William did not start visiting until after his paternity was established in October 2004. Cheryl Korade, a family resource coordinator with the Agency, testified that Connie attended 95% of the visits while William attended about half of the time. When William was absent, it was because he was at work, was not feeling good, or was waiting for a disability check in the mail. William never notified the Agency he would not be able to come, never asked to reschedule or make up for a missed visit, and never provided his work schedule. The grandmother was always present at the visits with Connie.
 {¶ 12} Korade testified that before William started visitation and when C.E. was Connie's only child, Connie devoted her attention to C.E. Yet, even after she learned how to care for him, she had to be reminded on several occasions to implement her parenting skills. In addition, Connie was at a loss whenever a situation out of the ordinary arose. Following the birth of her daughter in March 2005, Connie's interaction with C.E. during visitation became sporadic. Korade testified that William typically interacts with C.E. and takes care of him while Connie is busy with their daughter. When William is absent, Connie very seldom does the chores regarding C.E., instead relying on the grandmother. If reminded, Connie will do the chores herself. She, however, needs to be redirected frequently.
 {¶ 13} Jennifer Tye, a caseworker with the Agency, testified that at the time of the hearings, appellants are not ready for unsupervised visitation. Appellants have never asked for unsupervised visitation, nor have they asked that a family member, rather than the Agency, supervise their visits with C.E. Tye also testified that based on their past history with children services agencies, she would not let C.E. alone with either the grandmother or the aunt. Testimony revealed that the grandmother has an extensive history with the Agency and children services agencies in Kentucky and Florida, and that her children, including Connie, were removed from her at different times because of concerns regarding neglect, sexual abuse, and lack of proper necessities. The aunt, in turn, permanently lost custody of her three children.
 {¶ 14} Appellants testified that based on their social security and disability checks and William's part time job at Taco Bell, they have a monthly combined income of about $1,200. Connie has been unemployed since 2001. Despite the budget lessons from the DLS program, both appellants let the grandmother deal with the budget and pay the monthly bills. Despite the grandmother's and aunt's past histories with the Agency, both appellants would let these relatives care for C.E. if need be. Connie has been in counseling since 2001 which helps her with stress and coping skills. She testified that (1) she knows C.E. is behind, (2) she no longer has trouble changing him, (3) she loves him very much and is bonded with him, (4) other than feeding him pudding once, she has only given him milk, and (5) it would be in C.E.'s best interest to be with her because she wants to prove she can take care of him. She further testified that William is a great father, that she plans to stay with him, and that she has never seen him "real angry."
 {¶ 15} William testified that he has never lived alone, and that he has never done a budget but that he would try to do it himself if the grandmother no longer did it. William stated that his anger problem is under control. He explained that he refused to be evaluated because he did not feel comfortable with it. William testified that (1) he knows C.E. is behind, (2) he has never fed him with a spoon, (3) he would keep on trying to teach him how to walk and talk, (4) he believes he can care for C.E. on his own if he had to, and (5) he is bonded with C.E. Although he was never forthcoming, during the proceedings, as to his parenting experience or ability, William stated he took care of nephews on his own when they were infants. William also testified that Connie is a good mother who can care for C.E. by herself, and that he will stay with her as long as he lives.
 {¶ 16} As noted earlier, although not apparent at birth, C.E. has several developmental delays. At the time of the hearings, C.E. was 19 months old. Yet, he could not walk, stand on his own, hold his bottle, or feed himself. C.E. has problems eating and is still eating stage II baby food, a softer diet. He has sensory issues which makes him very upset, needs two adults to give him a bath because he is very scared of water, and gets very upset anytime something new is introduced to him. C.E. receives developmental and speech exercises two hours every day from his foster family in addition to the several therapies he receives outside of the home. The only word he says is "ma-ma." Although he does not walk, he moves around all the time and needs constant supervision. Because he needs a lot of one on one attention, daycare is not an option. Korade testified that because the amount of care C.E. needs is "extreme," she was concerned about appellants' ability to meet their son's needs. Korade also testified that Connie had to be told her son was delayed, and that William does not understand the child's delays. C.E. has bonded with his foster parents who wish to adopt him.
 {¶ 17} In October 2005, the magistrate granted permanent custody of the child to the Agency, subject to approval of the trial court. The magistrate found, by clear and convincing evidence, that permanent custody to the Agency was in C.E.'s best interest and that C.E. could not be placed with either parent within a reasonable time period. Appellants each filed objections to the magistrate's decision. On January 13, 2006, the trial court overruled the objections and adopted the magistrate's decision. Appellants both appealed, each raising one assignment of error:
 {¶ 18} Connie's Assignment of Error:
 {¶ 19} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY GRANTING THE [AGENCY'S] MOTION FOR PERMANENT CUSTODY."
 {¶ 20} William's Assignment of Error:
 {¶ 21} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN FINDING THAT THE STATE HAD MET ITS BURDEN BY CLEAR AND CONVINCING EVIDENCE THAT THE APPELLANT COULD NOT ADEQUATELY PARENT HIS SON."
 {¶ 22} Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence, that it is in the best interest of the child to do so, and, as the trial court found relevant to the present case, that one of the following circumstances apply:
 {¶ 23} "(a) The child * * * cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents."
 {¶ 24} R.C. 2151.414(D) provides that in considering the best interest of a child in a permanent custody hearing, "the court shall consider all relevant factors," including: the interaction and interrelationship of the child with the child's parents, relatives, and foster caregivers; the wishes of the child expressed directly or through the child's guardian ad litem; the custodial history of the child; the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.
 {¶ 25} In determining whether a child can be placed with either parent within a reasonable time period, the court must consider all relevant evidence. R.C. 2151.414(E). The court shall enter a finding that the child cannot be placed with either parent if one or more of several factors enumerated in R.C.2151.414(E) are found to apply to the case. As the trial court found relevant to the present case, those factors include:
 {¶ 26} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 {¶ 27} "(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to [R.C. 2151.414(A)] or for the purposes of [R.C. 2151.353(A)(4)]."
 {¶ 28} An appellate court's review of a trial court's decision finding clear and convincing evidence is limited to whether there is competent credible evidence in the record supporting the trial court's determination. In re Starkey,150 Ohio App.3d 612, 2002-Ohio-6892, ¶ 16. A reviewing court will reverse a finding by the trial court that the evidence was clear and convincing only if there is a sufficient conflict in the evidence presented. In re Rodgers (2000), 138 Ohio App.3d 510,519-520.
 {¶ 29} In her assignment of error, Connie argues that the trial court erred by granting permanent custody of C.E. to the Agency. Connie contends that the trial court's findings that it is in C.E.'s best interest to grant permanent custody to the Agency and that C.E. cannot be placed with her within a reasonable period of time are not supported by clear and convincing evidence.
 {¶ 30} Viewing the facts of this case in light of the factors set forth in R.C. 2151.414(D), we find that, while it is clear Connie loves her son, it is in C.E.'s best interest that the Agency be granted permanent custody. While C.E. is bonded with Connie, smiles at her, and responds to her, the record shows that following the birth of his sister, he has been somewhat abandoned by his mother during visitation because Connie has trouble parenting two children at the same time. C.E. is bonded with his foster parents who are able to meet all of his needs. C.E., who suffers from several developmental problems and requires a great deal of care and therapy, receives comprehensive and vigilant care from his foster parents. C.E., who was 19 months old at the time of the hearings, has been with his foster parents since he was nine days old. Korade testified that C.E. is elated with his foster mother and that he does not react that way with other parties involved in the case. In her appellate brief, Connie concedes that "C.E. is in great need of a legally secure and permanent placement." Tye, the caseworker assigned to appellants, testified that C.E.'s need for a legally secure permanent placement could not be achieved without a grant of permanent custody to the Agency. Finally, C.E.'s guardian ad litem recommended granting the Agency permanent custody.
 {¶ 31} Given these facts, we find that the trial court correctly determined that granting permanent custody of C.E. to the Agency is in the best interest of the child.
 {¶ 32} We further find that considering the facts of this case, the trial court did not err by finding that R.C.2151.414(E)(1) applies to the case at bar, and thus, that C.E. could not be placed with Connie within a reasonable period of time. The Agency became involved after receiving a referral that Connie, then age 29, was immature, had the mind of an eight year old, and may not have basic supplies to care for her son. The child was removed after the Agency received further information that Connie had difficulty caring for her son and that she needed constant supervision with constant prompting to meet the child's basic needs. After C.E. was adjudicated dependent, Connie, who was represented by counsel and had a guardian ad litem, stipulated that she needed to learn appropriate parenting skills and that she wanted a new living environment in which to bring her son.
 {¶ 33} The record shows that while Connie's current home (her fourth since the beginning of the proceedings) is in a much better condition than previous homes, housekeeping and safety issues remain despite the two DSL programs Connie attended. Likewise, although Connie has greatly improved her parenting skills and has finally mastered basic care techniques (such as changing a diaper and feeding C.E.), she remains at a loss whenever non-routine issues arise, even if she has been instructed on those issues on prior occasions. According to Korade, Connie still needs supervision during visitation.
 {¶ 34} Until she was told, Connie was unaware of C.E.'s several developmental delays. As previously noted, C.E. requires constant supervision, needs a lot of one on one attention, and is provided with two hours of therapy by his foster parents at their house. Since the birth of her daughter, Connie's interaction with C.E. during visitation has been sporadic. The record shows that when William is absent from visitation, Connie relies on the grandmother to take care of C.E. and that she has to be redirected frequently about that. When William is present, it is he who takes care of C.E., and not Connie. Likewise, the record shows that despite the DLS programs, Connie, who has never lived on her own, relies on the grandmother to deal with budget issues and monthly bills. Despite the services provided to Connie by the Agency, and Connie's progress and improvements, the Agency never felt that Connie could be granted unsupervised visitation.
 {¶ 35} There is no question that Connie loves her son, wants him in her house, and desires to be a good and effective parent. However, as the magistrate found, Connie "has made a good faith effort to participate in every service offered by the agency. Unfortunately, due to the combination of mother's limitations and [C.E.'s] special needs, [Connie] has been unable to progress significantly in her ability to provide for her son on a daily basis. This case has been pending for nearly two years and the parents have not yet progressed to the point of being able to exercise unsupervised visitation. [In addition, Connie's] willingness to allow [the grandmother and aunt] to care for [C.E.], given their history, causes the court to have significant concerns regarding the judgment of mother.
 {¶ 36} "[T]he court concludes that following the placement of [C.E.] outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused [C.E.] to be placed outside the home, the parents have failed continuously and repeatedly to substantially remedy the conditions causing [C.E.] to be placed outside his home."
 {¶ 37} Having thoroughly reviewed the record, we find that sufficient credible evidence supports the trial court's decision to terminate Connie's parental rights and to grant permanent custody of C.E. to the Agency.[2] Connie's assignment of error is overruled.
 {¶ 38} In his assignment of error, William argues that the trial court erred by finding he could not adequately parent his son. Specifically, William first challenges the fact he was never considered independently for custody of his son. William contends that simply adding him to the case plan "failed to address services [he] might have needed * * *, were he to be considered for placement on his own, or at least as the primary caregiver." William also argues that the Agency failed to prove that "reasonable efforts were made to allow [C.E.] to be raised by a parent or other family member."
 {¶ 39} As previously noted, William refused to undergo a psychological evaluation even though he knew why he needed to be evaluated. As a result, the Agency was unable to identify William's strengths and weaknesses and to assess which services, if any, William needed. William, in turn, was not provided with individual and tailored services. For William to refuse to be evaluated and then fault the Agency for failing to provide him with services, more intensive parenting training, and instructions from the child's numerous therapists is disingenuous. We note that once his paternity was established, William attended visitation as well as the DLS programs. Yet, despite these programs, the Agency never felt appellants were ready for unsupervised visitation, let alone to be custodial parents or primary caregivers.
 {¶ 40} The record shows that William, age 38, has never lived alone, had never worked until he started working for Taco Bell, has never done a budget, and lets the grandmother take care of the household budget and monthly bills. In addition to refusing to be evaluated, William has never been forthcoming during the proceedings as to his parenting experience and ability. Appellants never asked for unsupervised visitation or for the visits to be supervised by someone other than the Agency. While William is bonded with his son and interacts with and takes care of him during visitation, there is no evidence he ever took a lead role in caring for C.E. Further, Korade testified that she had to step in during visitation whenever non-routine issues arose, even after she had instructed appellants on those issues on prior occasions. There is no evidence that William, who was represented by counsel and had a guardian ad litem, ever asked to be considered as C.E.'s custodial parent or primary caregiver. William has never asked for more training with Lavender or to spend time with C.E.'s therapists.
 {¶ 41} In addition, despite their past history with children services agencies, William testified he would let the grandmother and aunt take care of C.E. if need be. As the magistrate found, William's "willingness to allow theses individuals to care for [C.E.], given their history, causes the court to have significant concerns regarding [William's] judgment." William was also vague as to how he would take care of his son if he were the child's custodial parent and working full time.
 {¶ 42} After thoroughly reviewing the record, we cannot say that the Agency failed to make reasonable efforts to allow C.E. to be reared by William. With regard to other relatives allegedly not considered by the Agency, we note that no relatives came forward to be considered for placement. The only relatives that see C.E. on a regular basis are the grandmother and aunt. It is axiomatic that these relatives are not suitable and cannot be considered by the Agency for placement.
 {¶ 43} In light of the foregoing, we find that the trial court did not err by finding that William could not adequately parent his son. The trial court, therefore, properly granted permanent custody of C.E. to the Agency. William's assignment of error is overruled.
 {¶ 44} Judgment affirmed.
Powell, P.J., and Walsh, J., concur.
[1] Dr. Moore testified that when a parent has schizotypal personality disorder, "the child can be seen as an object instead of a person and * * * there could be, for example, unusual expectations of the child. People with the personality disorder * * * are somewhat child like in their own orientation, unable to discern a child's developmental needs and again the expectations can be unrealistically high for a child. Judgment typically is impaired in that respect too, if one doesn't understand how the infant is somewhat unique or different from oneself." Dr. Moore testified that Connie presented three symptoms of the disorder. A full diagnosis for the disorder requires five symptoms. Because he did not have enough information, Dr. Moore could not say whether Connie had schizotypal personality disorder.
[2] Because only one factor need apply under R.C. 2151.414(E) to support a trial court's finding that a child cannot be placed with either parent within a reasonable period of time, and because the trial court properly found R.C. 2151.414(E)(1) to apply to the case at bar, we decline to review the trial court's determination that R.C. 2151.414(E)(2) also applies.