OPINION *Page 2 
{¶ 1} This is an appeal from the Lake County Court of Common Pleas, Juvenile Division, terminating the parental rights of both Mother and Father and granting permanent custody of their two children to Lake County Department of Job and Family Services ("LCDJFS").
 {¶ 2} On July 1, 2005 LCDJFS filed a motion for temporary custody seeking to terminate the legal custody granted to the paternal aunt and uncle in a prior proceeding which is not subject of this appeal,[1]
alleging that the children, Heather Spicuzza (born December 10, 1997) and Jennifer Spicuzza (born July 11, 2000) were without proper parental care and dependent as they were living with their aunt and uncle who could no longer care for them. On August 2, 2005, hearing was held, without the parents or relatives present, on the motion of LCDJFS for temporary custody of the minor children finding them dependent without proper parental care. The trial court found the motion well-taken, temporary custody being granted on August 3, 2005.[2]
 {¶ 3} The facts in the record leading to the filing of temporary custody are as follows. On March 3, 2004, the Eastlake Police Department was informed of possible sexual contact between Barbara ("Mother") and William ("Father") Spicuzza and Mother's fourteen-year-old daughter from a previous marriage. The couple was *Page 3 
interviewed by police who determined that ongoing inappropriate behavior had taken place. Ultimately, Father pled guilty to attempted rape, a felony of the second degree, and sexual battery, a felony of the third degree. Mother pled guilty to child endangering, a misdemeanor of the first degree, for her role. It is uncontroverted that Father is incarcerated and will remain so for at least four years after the granting of permanent custody. He does not assert a custodial or companionship interest in the children, nor is he presently complying with a case plan. It is uncontroverted that the two subject children did not witness and were not involved in any of the abuse. The only victim was the fourteen-year-old daughter of Mother.
 {¶ 4} At the time, LCDJFS was concerned about the risk to the Mother's and Father's own children, Heather and Jennifer, and a case plan was developed for the family. The children were placed in the care of their paternal grandparents on March 11, 2004, where they remained until June 26, 2004. On June 26, 2004, Patrick and Michelle Spicuzza, Father's brother and sister-in-law, paternal uncle and aunt took legal custody of the girls. The girls remained in their custody until August 3, 2005. During this period of time, Mother visited her children on a regular basis and had a close, loving relationship.
 {¶ 5} Due to a difficulty with the aunt and uncle who had legal custody of the children, LCDJFS filed a motion for dependency stating a need to remove the children at the request of the aunt and uncle. On July 1, 2005, LCDJFS filed a motion for temporary custody.[3] *Page 4 
 {¶ 6} On August 3, 2005 they were removed from their aunt and uncle's home and placed in a foster home. The girls resided in this foster home until February 10, 2006, then were removed to another foster home, where they remained until the permanent custody hearing. On November 30, 2006, LCDJFS filed a motion for permanent custody of the Spicuzza minor children.
 {¶ 7} The permanent custody hearing began on March 27, 2007. Mother argued that in the event the trial court found her unsuitable the children be placed in a Planned Permanent Living Arrangement ("PPLA"), and that permanent custody be denied. The LCDJFS argued that PPLA was not an option as they had not requested it.
 {¶ 8} The trial for permanent custody produced the following facts, many of which were placed in the trial court's judgment entry. The children have had a good and loving relationship with their Mother, albeit irregular and supervised. They have developed an excellent relationship with their foster parents; however, these foster parents are not able to adopt them. The children wish to live with their Mother. Mother's IQ is between 65 and 75. This places her intellectual functioning in the category of mild mental retardation. She was unable to hold a steady job and unable to navigate the public transit system regularly.
 {¶ 9} A case plan had been implemented for the Spicuzza family; Mother was referred to services by the LCDJFS. Mother had to complete a sexual offender assessment; participate in individual and group therapy; and maintain stable employment, housing, and finances. The testimony revealed that the expectations and requirements of the case plan were overwhelming to Mother financially and mentally given her cognitive limitations. LCDJFS made all the necessary referrals but did little to *Page 5 
accommodate, coordinate or facilitate her in the completion of her plan. The testimony revealed that Mother needed sufficiently suitable housing for a family, but was not eligible for public assistance in housing or a Section 8 subsidy unless the children were in her possession. In effect, the plan required a mildly mentally retarded person not eligible for public assistance, without any notable work history or skills, and without health insurance, to rent a two bedroom apartment, hold a full time job, attend multiple visitations and counseling appointments without any transportation, to regain custody of her children. The plan anticipated that Mother would learn to be completely self-sufficient, and that she would do this without a spouse or male companion, due to the fact she had allowed her husband, to sexually abuse her elder daughter in her presence. The expectations contained in the case plan and the time frame allowed for its completion were noted by the treatment providers. Due to transportation issues, Mother would miss appointments. Despite these obstacles Mother completed substantial portions of the plan. The trial court in an earlier judgment entry called for unsupervised visits with the children.
 {¶ 10} Mother was referred to Christine George, a counselor therapist at Neighboring. Mother was a client from November 2005 until August 10, 2006, but only completed eight appointments. Ms. George testified that they were supposed to meet every two weeks, but there were times when Mother would fail to show without calling and many other times that she would cancel the appointments. She further testified that Mother had love and affection for her children, but was unsuccessful in completing the requirements of her case plan because she would not attend appointments, had trouble *Page 6 
maintaining employment and stable housing, and was living with a controlling and verbally abusive man.
 {¶ 11} Mother was also referred to Margie Barbera, a Crossroads therapist. Ms. Barbera established several goals for Mother and the girls: improving attachment and bonding; building more positive coping skills to deal with anger, stress, and anxiety; and providing education and coaching on positive boundaries and parenting skills. Ms. Barbera testified that Mother had difficulty accurately reading and responding to cues, and expressed concerns about Mother's judgment and problem solving skills. Mother was referred to an individual therapist, and the girls were diagnosed with the following disorders: generalized anxiety disorder, attachment impairment, bonding disturbance, oppositional defiant disorder, and post-traumatic stress disorder. Heather was also diagnosed with mild to moderate cognitive emotional and social delays as well as attention deficit hyperactivity disorder.
 {¶ 12} Ms. Barbera testified that Mother was very consistent at the beginning but began having trouble making and keeping appointments. Also, some improvements were made, but the family still had problems with bonding and attachment. Additionally, Ms. Barbera offered support and assistance in an attempt to find Mother employment.
 {¶ 13} Mother was referred to Pathways for medical assessment and to the Bureau of Vocational Rehabilitation; she made appointments but did not follow through. The Department did assist and facilitate visitation between Mother and her children, and explored many options for placement of the children with family members, including with grandparents and their aunt and uncle. These failed. *Page 7 
 {¶ 14} Mother admitted that she is not currently in a situation where she can support and care for her children. She would need to find alternative housing but does not currently have the money to do so. Mother sometimes missed appointments because she lost track of when they were and stopped going to appointments with Christine George because she felt discouraged. In a judgment entry dated July 13, 2007, the trial court found, by clear and convincing evidence, that neither parent was capable of providing for the children within a reasonable time and granted permanent custody to LCDJFS. Mother and Father have filed separate timely appeals which have now been consolidated.
 {¶ 15} Father asserts the following assignments of error:
 {¶ 16} "[1.] The trial court erred in finding that Lake County Department of Family Services (LCDJFS) made all reasonable efforts to avoid the continued removal of the children and return them to their mother and such finding was arbitrary.
 {¶ 17} "[2.] The trial court erred in finding that the appellant mother is not capable of caring for or providing for her children and that she failed to comply with the case plan, such a finding is against the manifest weight of the evidence."
 {¶ 18} Mother asserts the following assignments of error:
 {¶ 19} "[1.] The Ruling of the Trial Court was against the manifest weight * * * and sufficiency of the evidence.
 {¶ 20} "[2.] The Court erred by basing its decision to terminate parental rights on the limited cognitive abilities of the Mother.
 {¶ 21} "[3.] The Court erred as a matter of fact and law and abused its discretion when it found that the State had made reasonable efforts and despite such efforts, the *Page 8 
children could not be placed with their Mother within a reasonable period of time, thereby finding that permanent custody terminating the parental rights of the mother was appropriate and in the children's best interest."
 {¶ 22} First we must note the Supreme Court of Ohio has defined the importance and deference courts must give to proceedings which permit a child welfare agency to assume permanent custody of a child. The termination of parental rights is "the family law equivalent of the death penalty * * *." In re Phillips, 11th Dist. No. 2005-A-0020,2005-Ohio-3774, at ¶ 22, citing In re Hoffman, 97 Ohio St.3d 92,2002-Ohio-5368, at ¶ 14. See, also, In re Murray (1990),52 Ohio St.3d 155, 157 (stating that a parent has a "`fundamental liberty interest'" in the care, custody, and management of his or her child and an "`essential'" and "`basic civil right'" to raise them). (Citations omitted.) Based upon these principles, the Ohio Supreme Court has determined that a parent "`must be afforded every procedural and substantive protection the law allows.'" (Citation omitted.) In reHayes (1997), 79 Ohio St.3d 46, 48.
 {¶ 23} In the context of terminating parental rights, our standard of review on appeal is whether the juvenile court abused its discretion.In re Snow, 11th Dist. No. 2003-P-0080, 2004-Ohio-1519, at ¶ 28. "The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable.'" Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. Regarding this standard, we recall the term "abuse of discretion" is one of art, essentially connoting judgment exercised by a court which neither comports with reason, nor the record. State v.Ferranto (1925), 112 Ohio St. 667, 676-678. *Page 9 
 {¶ 24} The juvenile court may terminate the rights of a natural parent and grant permanent custody of the child to the moving party only if it determines, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency that filed the motion, and that one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present. Clear and convincing evidence is more than a mere preponderance of the evidence; it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. In reAdoption of Holcomb (1985), 18 Ohio St.3d 361, 368.
 {¶ 25} For the purposes of our analysis, we will consolidate certain assignments of error and address others out of the order in which they are presented.
 {¶ 26} Father's second assignment of error is almost identical in substance to Mother's first, and they will be addressed together. In essence, the parties assert that the ruling of the trial court was against the manifest weight and sufficiency of the evidence. We disagree.
 {¶ 27} When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In re Ozmun (Apr. 14, 1999), 9th Dist. No. 18983, 1999 Ohio App. LEXIS 1734, at 3-4. In determining whether a criminal conviction is against the manifest weight of the evidence:
 {¶ 28} "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial *Page 10 
ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" State v. Thompkins (1997),78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 29} Accordingly, before an appellate court will reverse a judgment as being against the manifest weight of the evidence, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.
 {¶ 30} The test for sufficiency in this context is essentially the same, i.e., whether the trial court's judgment could be reasonably reached from the evidence presented. "The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence. (* * *)' * * * `In essence, sufficiency is a test of adequacy[;] [w]hether the evidence is legally sufficient to sustain a verdict (* * *).' * * * Thus, sufficiency of the evidence tests the burden of production."In re White, 11th Dist. No. 2006-A-0065, 2007-Ohio-1782, at ¶ 6. (Internal citations omitted). The trial court in this case made detailed findings, all supported by competent, credible evidence. It found that, while Mother was incapable of terminating the sexual abuse incident with her older daughter because her will was overpowered, still, she allowed it to happen and might do so again. As the trial court noted in its judgment entry, "[t]his clear danger cannot be allowed".
 {¶ 31} The reason for the original removal in this case was that the Mother allowed her oldest child of fourteen to engage in sexual relations with her husband. It is clear from the record, based upon the testimony of Mother, and the mental health *Page 11 
professionals involved, that at the time of the incident Mother did not appreciate or comprehend the implications of her failure to protect her child in favor of her husband, who financially supported the entire family. The agency needed to prove that Mother did not remedy or correct the reason for the initial removal, and that she could not protect her children in case the situation arouse again. In essence, if Mother could not learn to be independent emotionally and manage basic life skills, she would be vulnerable, as would her children, to abuse.
 {¶ 32} LCDJFS met its burden. The case plan was designed to educate Mother and provide her the skills to be independent enough to choose to protect her children from abuse, despite being faced with a loss of her marriage or her primary financial support. LCDJFS clearly attempted relative residential placement. It was very clear from Mother's testimony that she could not assume primary care of her children without ongoing disability services, housing services and public assistance.
 {¶ 33} There was sufficient evidence in the record to justify both the weight and sufficiency of the trial court's findings. The compelling evidence of Mother's love for and bond with her children, as well as their love and attachment to her, were recognized by the trial court in its entry. Clearly, that court did not enter its judgment without painfully weighing the alternatives. It is clear from the record that while Mother received insufficient disability accommodation and minimal assistance from the agency in completing her case plan, she was unable to assume care properly without some wrap around mental health services. We determine Father's second assignment of error and Mother's first assignment of error to be without merit. *Page 12 
 {¶ 34} Since Father's first assignment of error raises an assignment of error similar to Mother's third assignment of error, they too will be addressed together. Father alleges that the trial court erred in finding that LCDJFS made all reasonable efforts to avoid the continued removal of the children and return them to their Mother, and such finding was arbitrary. Mother asserts the following error: "[t]he Court erred as a matter of fact and law and abused its discretion when it found that the State had made reasonable efforts and despite such efforts, the children could not be placed with their Mother within a reasonable period of time, thereby finding that permanent custody terminating the parental rights of the mother was appropriate and in the children's best interest."
 {¶ 35} We initially note that all reasonable efforts are not required before a grant of permanent custody can be made. The agency is only required to use reasonable efforts in effectuating a case plan. The Ohio Supreme Court has held that, except for a few narrowly defined exceptions, the state must have made reasonable efforts to reunify a family prior to the termination of parental rights. Ohio's Department of Job and Family Services has promulgated regulations that describe reasonable efforts in great detail. See, e.g., Ohio Adm. Code5101:2-39-05. In addition, the Ohio Rules of Juvenile Procedure require that in any proceeding involving abuse, neglect, or dependency at which a court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the person who filed the complaint in the case, and removed the child from the child's home, has made reasonable efforts to do the things listed under Juv.R. 27(B)(1)(a) through (c). In Re C.F., 113 Ohio St.3d 73,2007-Ohio-1104, at ¶ 30-33. As detailed above, LCDJFS made *Page 13 
reasonable efforts, and the findings of the trial court were not arbitrary as there was evidence in the record to support its conclusions.
 {¶ 36} As to Mother's assertions, R.C. 2151.353(A)(4) provides that if a child is adjudicated abused, neglected, or dependent, the court may commit the child to the permanent custody of a children services agency if the court determines, in accordance with R.C. 2151.414(E): (1) that the child cannot be placed with one of the child's parents within a reasonable time, or should not be placed with either parent; and (2) determines in accordance with R.C. 2151.414(D) that the permanent commitment is in the best interest of the child.
 {¶ 37} After an adjudication of neglect or dependency, a juvenile court may terminate parental rights and award permanent custody of a child to the proper agency if it finds by clear and convincing evidence that the following prongs of the permanent custody statute are satisfied: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least twelve months of a consecutive twenty-two month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). R.C.2151.414(B)(1) and (2).
 {¶ 38} "Therefore, R.C. 2151.414(B) establishes a two-pronged analysis that the juvenile court must apply when ruling on a motion for permanent custody. In practice, the juvenile court will usually determine whether one of the four circumstances *Page 14 
delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.
 {¶ 39} "If the child is not abandoned or orphaned, then the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the juvenile court must consider all relevant evidence before making this determination. The juvenile court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the conditions enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.
 {¶ 40} "Assuming the juvenile court ascertains that one of the four circumstances listed in R.C. 2151.414(B)(1)(a) through (d) is present, then the court proceeds to an analysis of the child's best interest. In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates that the juvenile court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody[.]"Phillips, supra, at ¶ 25-27.
 {¶ 41} While non-compliance with a case plan is not enough to terminate an appellant's parental rights, his or her repeated failures to remedy the circumstances *Page 15 
which resulted in the children's removal is enough. R.C. 2151.414(E) places responsibility on the parent to remedy the situation that caused the children to be placed outside the home.
 {¶ 42} Mother argues that the case plan initiated by LCDJFS was, in effect, an "unfunded mandate," and that the agency cannot require a case plan which is impossible to complete and afford.[4] This allegation is not supported by the record, nor was an argument made in the trial court, or an assignment of error raised on appeal, relating to the denial of due process under the federal or state constitutions. Neither was an argument made in the trial court, or error assigned, regarding failure to accommodate a disability. The case plans were never challenged by counsel at the initial filing or in the proceedings, but only after the filing of permanent custody during trial two years after the initial removal. Frequently, a problem arises with a parent having significant cognitive limitations, and who may need additional support. However, this case plan does not contain those wrap around or follow up services.
 {¶ 43} The issue of discrimination based upon mental disability due to the failure of the agency to provide disability services in the form of a case plan geared toward Mother's mental retardation was not raised on appeal, nor do we address this issue in this appeal. "It is well established that an appellant may not assert a new theory for the first time before an appellate court." Poluse v. Youngstown (1999),135 Ohio App.3d 720, 728, citing Kalish v. Trans World Airlines (1977),50 Ohio St.2d 73. For this reason, we need not address it. *Page 16 
 {¶ 44} There is no requirement in the statute that the agency go to extraordinary measures to assist a mentally retarded parent in completing their case plan. The agency referred Mother to Neighboring and to other mental health services. There was no coordination between the county and the services provided, despite Mother's cognitive limitations. Unfortunately for the children, the permanent custody statute does not address any reasonable accommodation for the mentally retarded. Although best practices, with diligent case planning and good social work being desirable, the statute forgoes those requirements, and only requires reasonableness. Mother's effort given her limitations were heroic, but the trial court is required to follow the law, and, if all prongs of the statutory test are met and the parents afforded all constitutional protections, the trial court must evaluate the evidence based upon the best interest of the children. The first priority in that mandate is their safety. The trial court could not place these children within a reasonable time with their Mother unless it was proven that she had remedied the reason for removal. In essence, was she independent enough, despite her limitations and lack of support services, to keep her children safe from her spouse or financial supporter in the event the children were put in danger? The record did not support that finding and the trial court did not err based upon the evidence presented. Father's first assignment of error and Mother's third assignment of error are without merit.
 {¶ 45} The second assignment of error raised by Mother asserts that the court erred by basing its decision to terminate parental rights on her limited cognitive abilities. We disagree. *Page 17 
 {¶ 46} In support of her assignment, mother relies on In re D.A.,113 Ohio St.3d 88, 2007-Ohio-1105. The Supreme Court in In re D.A. restates the duty of juvenile courts to safeguard the rights of all litigants in proceedings and underscores the fundamental right of parents to raise their children. It firmly establishes that parents who are mentally retarded will not lose their children simply because they cannot raise their children in "the best possible way." The law and public policy of our state are set up to preserve families and establish the presumption that it is always in a child's best interest to live with his or her parents if the parents can supply an adequate and safe environment. As the In re D.A. court states, at ¶ 37:
 {¶ 47} "We do not mean to minimize the trial court's concern about appellants' ability to parent their son. R.C. 2151.414, however, does not permit a parent's fundamental right to raise his or her child to be terminated based on mental retardation alone. In other cases in which the parental rights of mentally retarded persons have been terminated pursuant to R.C. 2151.414(E)(1) or (2), objective evidence existed to show that the statute was satisfied. See, e.g., In re C.E., Butler App. Nos. CA2006-01-015 and CA2006-02-024, 2006-Ohio-4827 (the mother needed constant supervision and prompting to meet child's basic needs and had inadequate housing); In re King, Fairfield App. No. 05 CA 77,2006-Ohio-781 (the mother consistently relied on others to meet many of her basic needs and lost her housing)."
 {¶ 48} However, the In re D.A. court also held: "[t]he fundamental interest of parents is not absolute, however. Once the case reaches the disposition phase, the best interest of the child controls. The termination of parental rights should be an *Page 18 
alternative of `last resort.'" Id. at ¶ 11, quoting In reCunningham (1979), 59 Ohio St.2d 100, 105.
 {¶ 49} The holding in In re D.A. illustrates the problem quite succinctly: parents who are mentally retarded, even mildly so, may have difficulty parenting and maintaining minimum standards of care for their children, due to their cognitive functioning, without some type of support network, either spousal, familial, or public mental health services. Some children have become dependent or neglected not because their parents are mentally retarded, but because their parents' lower cognitive abilities make it more difficult for them to obtain traditional housing or employment, or evaluate relationship choices and to anticipate long term consequences. Relatively complex tasks, such as making and attending counseling appointments during a lunch break, while attempting to navigate the public transportation system, which can challenge most people of average cognitive ability, may cause them to fail to complete their case plans, unless special disability accomodation is placed in the case plan from the start, or provided by the agency just as a measure of best practices.
 {¶ 50} The case at bar is full of objective facts that demonstrate Mother cannot, at this time, independently care for these children and keep them safe. It is unclear from the record (due to the lack of comprehensive testing and expert testimony), if this is due to Mother's limited cognitive ability or to some mental illness. Although the trial court relied on her cognitive limitations as a factor, there were other objective facts that satisified the statutory criteria for permanent custody. It is up to the parties to make the record. The travesty is that this Mother clearly is dedicated to loving and working to the best of her ability to be with her children. The children have been in four separate *Page 19 
placements and have developed bonding disorders. Their present placement is non-adoptive. They want to be with their mother. The trial court was forced by the agency's objection to Mother's motion for PPLA to either deny permanent custody (and take the risk that the agency would return the children without proper support in place), or file for PPLA, or terminate Mother's parental rights, even though there is no evidence in the record of the children's likely adoption. The trial court's grant of permanent custody renders these children parentless. Their only caregivers are people paid by the State of Ohio Children and Family Services.
 {¶ 51} Mother's second assignment of error is without merit.
 {¶ 52} The judgment of the Lake County Court of Common Pleas, Juvenile Division, is affirmed.
CYNTHIA WESTCOTT RICE, J., concurs in judgment only, TIMOTHY P. CANNON, J., concurs in judgment only.
[1] This motion was not served or properly initiated pursuant to Civ.R. 4(B). None of the parties were served or present at the temporary custody trial. No evidence was taken (see Entry 71) and, as such, the court lacks jurisdiction over the parties on the trial court's motion.
[2] Neither the parents nor the aunt and uncle were served with a copy of the order, nor were they served with a notice of the hearing.
[3] This motion was not served or properly initiated pursuant to Civ.R. 4(B). None of the parties were served, and, as such, the court lacks in personam jurisdiction over the parties on the trial court's motion.
[4] For instance, Mother was required to undergo a sexual offender evaluation, which is expensive. Yet, LCDJFS provided her no funding for this. *Page 1