[Cite as *In re E.A.G.*, 2024-Ohio-315.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| | : | |
| E.A.G. | : | Case Nos. 23CA7 |
| | : | 23CA8 |
| | : | |
| | : | |
| | : | |
| | : | DECISION AND JUDGMENT |
| | : | ENTRY |
| | : | |
| | : | **RELEASED 1/16/2024** |

_____

### APPEARANCES:

Alana Van Gundy, Bellbrook, Ohio, for Appellant Rodney Gillespie.

Julie Dreher, Killbuck, Ohio, for Appellant Brienne Gibson.

Kelsey R. Riffle, Washington County Assistant Prosecuting Attorney, Marietta, Ohio, for Appellee.

_____

Smith, J.

{¶1}  In this consolidated appeal, Appellants, Rodney Gillespie and Brienne Gibson, appeal the trial court's decision that granted permanent custody of their seven-year-old child, E.A.G., to Appellee, Washington County Children Services ("the agency").  For the reasons that follow, we do not find any merit to Appellants' assignments of error.  Therefore, we overrule Appellants' assignments of error and affirm the trial court's judgment.

FACTS

{¶2} On July 10, 2020, the Marietta Police Department contacted the agency to report that they had responded to the family's home due to a domestic violence disturbance between the child's father and an uncle. Police officers subsequently arrested the father, and they took the mother to the hospital because she was making suicidal statements. Officers advised the caseworker that "the conditions of the home were unfit for the child to live in."

{¶3} When the caseworker arrived, she found the home "to be in extremely bad conditions with every bit of flooring covered in trash and other debris." The home "did not have any working sewage disposal," and the child, who was five years old at the time, was wearing "pullups." Moreover, the child had been sleeping on a bed that had trash on it. Due to these circumstances, the agency asked the court to place the child in its emergency custody, and the trial court subsequently entered an ex parte emergency removal order.

{¶4} On July 13, 2020, the agency filed a complaint that alleged the child is a dependent child and that requested temporary custody of the child. The parents later admitted the dependency allegation, and the trial court placed the child in the agency's temporary custody.

{¶5} The agency developed a case plan for the family to help them reunify. The agency worked with the family for nearly two years and started to work on a

plan to transition the child to the home. During this time frame, the agency caseworkers worked with the parents to try to help them understand the importance of maintaining a safe home environment for the child and advised them to store hazardous items such as knives, lighters, and medications out of the child's reach. After the first overnight visit, however, the agency caseworker discovered that the parents had left a bottle of medication in a location that the child could have accessed. Thus, the agency did not believe that the parents had learned to implement the skills that they need to maintain a safe home environment for the child.

{¶6} Consequently, on June 7, 2022, the agency filed a permanent custody motion. The agency alleged that the child has been in its temporary custody for 12 or more months of a consecutive 22-month period and that placing the child in its permanent custody is in the child's best interest.

{¶7} On December 7, 2022, the trial court held a hearing to consider the agency's permanent custody motion. Patricia Smith, a field nurse with Quality of Life Home Care, testified as follows. Between June and September 2022, she visited the parents' home twice per day to "pass medications, check vitals, check glucometer readings, her blood sugars, any kind of education that might be needed based on vitals and blood sugars, and just an overall assessment, make sure that they were doing okay." On a date in September 2022, Smith had been attempting

to obtain the father's vital signs when the mother entered the room "with two cups of pills." Smith asked the mother what medications the parents were taking, and the mother stated that she had vitamins. Smith informed the mother that Smith might need to talk to the case manager, "[a]nd at that point it completely escalated." Smith explained that "[t]here was a lot of screaming, a lot of profanity." She asked the parents to stop yelling at her. The mother then "threw" the vitamin bottles at her. As a result of this incident, the parents were discharged from the program.

{¶8} Caseworker Alisha Riddle offered the following testimony. She has been the caseworker since February 2022. On July 10, 2020, the child was removed from the home due to a domestic violence incident and the deplorable conditions of the home. The child, who was five years old, was nonverbal and was not potty trained. The child also "had boils and rashes from wearing diapers far too long." Additionally, "[h]is skin had such a smell soaked into it that it had actually taken almost two weeks to get that kind of exfoliated from his skin." Shortly after the child's removal, the parents were evicted from their apartment. The mother initially stayed with some family. The father stayed at a motel, the Salvation Army, a homeless shelter, and a camper.

{¶9} The agency developed a case plan that required the parents to demonstrate that they can provide for the child's basic needs and maintain safe,

stable, and clean housing that is free of any safety hazards. In August 2021, the parents obtained a one-bedroom apartment, and they remained living in this apartment through the date of the permanent custody hearing.

{¶10} In February 2022, the agency started working on a transition plan to return the child to the parents' custody. While working on this transition plan, Riddle visited the parents' apartment 38 times. The parents have improved their ability to keep the home clean. However, the caseworkers sometimes found "old containers with food on the floor" and "pieces of food on the floor." Furthermore, the "litter boxes have come to a state where you know, there's been litter or cat feces on the ground, things like that." Other times, the apartment "looked very good." When caseworkers noticed cleanliness issues, they explained to the parents what they needed to do to fix it.

{¶11} During some of the unannounced home visits, caseworkers discovered "things like butane torch lighters," or knives or other sharp objects in locations where the child could reach them. Caseworkers also saw alcohol and "bottles of medication within [the child's] reach." The caseworkers stressed to the parents the need to keep these types of items in locations where they would not be accessible to the child.

{¶12} The caseworkers additionally informed the parents to use a lock for a balcony door so that the child, who is "very high, high energy to say the least,"

would not be able to exit this door. Riddle expressed concern that the child "could fall off the balcony, he could jump off, [or] he could run away." Riddle advised the parents that they need to ensure that the child cannot reach the door, but "that doesn't always happen." When she reminded them, the parents explained that they forgot. Riddle then emphasized to the parents that they "always have to practice what we know are best safety measures all the time as if [the child] was here."

{¶13} The parents' failure to keep the home in a safe condition for the child has been an ongoing concern that has "not really ever went away." Riddle stated that out of her 38 home visits, "three to four, maybe five of them have been perfect, you know, condition of no safety concerns."

{¶14} The case plan also required the parents to complete a mental health assessment and to follow any treatment recommendations. Both parents completed mental health assessments, and each works with an Integrated Services worker. The father attends an anger management program, and the parents continue to attend their mental health appointments.

{¶15} The case plan further required the parents to complete a domestic violence course. They completed the course work, but the father continues to struggle with controlling his anger. He has been in verbal altercations with staff. Riddle has "witnessed [the parents] in Domestic Violence altercations with staff, representatives, Integrated Services * * * workers, our Agency, [or] a mixture of

all of the above." One time, the father was "escalated for stealing from [the mother] in a visit." Another time, the agency had to call the police after learning that the father "had been masturbating outside of our Agency at the picnic table."

{¶16} Other times, Riddle has been in the parents' home, and the father "has been like this close to my face (indicating), screaming at me, shaking his hands at me." The mother would try to step in between Riddle and the father. The father then would go into another room and punch the wall or the door. The mother would try to calm him down, "and then they both have hands on each other."

{¶17} In October 2022, when Riddle learned that Quality of Life had terminated its services, she went to the parents' home to ask them about the incident with the nurse. The father started yelling at her. He then went into the bedroom and "like punched the door and punched the wall" and "slammed the door shut." The parents were physically fighting with each other, and the mother asked Riddle to leave, which she did.

{¶18} At times, the parents have had "good visits" with the child, meaning they did not need help from any caseworkers. Other visits were "a little more rough." During some visits, the father and the child "have fought over toys." Other times, the child became upset when the father ate some of the child's food. These types of incidents caused the child to become "escalated," and the father to become upset. The mother tried to "parent" the child and "to calm" the father.

Shorter, in-home visits, required "the continuous service of an Integrated Services provider being in the home still supervising those visits, and trying to do hands-on implemented parenting in their home while [the child] was visiting."

{¶19} In 2022, when the agency began working on a transition plan to return the child to the home, the agency started by having two-hour visits with an Integrated Services worker. The agency later increased the length to four hours and then further increased the length to eight hours. The parents "did well as far as their actual day visits when a provider was present."

{¶20} In June 2022, the parents had an overnight visit with the child. When Riddle arrived to retrieve the child the next morning, the father answered the door. She asked if she could enter the home, and the father allowed her inside. Once inside, she saw "an entire bottle of their Trazodone medication left" on a table that would have been within the child's reach. Riddle spoke with the parents and reminded them that they should not leave medication in a location where the child could reach it. She explained that "this type of medication is a concern" for the child. Riddle is concerned that if the child consumed any of the parents' medication and had a reaction to it, the parents may not be able to recognize the reaction and, thus, would not understand the need to seek medical treatment.

{¶21} After this overnight visit, the agency continued to work with the family so that the child could be returned to the parents' custody. Both parents

have made significant strides to improve their own lives.  However, "the bigger concern is with the inability to maintain some of the hazardous items that could in a split second, cause [the child] physical harm as well as these two parents escalating one another to the point where they're physically unsafe with each other."  Additionally, the child has his "own mental health concerns" and "delays or disability."  The child "has no understanding sometimes of the incident or the pain or the * * * don't touch the stove because it's hot type thing."  The child also "has a lot of behavioral concerns."  He has outbursts "where he'll hit, kick, throw things, flip desks at times."

{¶22} She stated that the combination of these facts caused the agency to question whether the parents could maintain the home in a safe condition, "or if it would be something where tragically he could get very seriously hurt."  The agency continued to work with the parents even after filing for permanent custody, but the parents did not reach a point where the agency felt that the child would be safe if placed in their care.

{¶23} The child's foster mother testified as follows.  The child has been in her home for 28 months.  When the child first entered her care, he "had a lot of odor" that did not dissipate for about two weeks.  He also had some boils, wore diapers, and was nonverbal.  He now is verbal and potty trained.

{¶24} The child receives counseling for his behaviors and requires frequent supervision. He "gets very mad, like, really fast, like you don't even know why, and he would hit his head on the floor, hits his hands, hits the kids real hard, and just I mean, he'll scream." The foster mother has concerns for the child's future. She explained that "sometimes he has more bad days than he does good." The foster mother has been waiting for a referral to take the child to be evaluated. He currently takes medication to help keep him calm, but she is waiting to speak to a doctor to discuss adjusting the dose because the medicine's effect seems to be waning.

{¶25} Although the foster mother is not planning to adopt the child, she is prepared to keep the child in her home until the agency is able to transition him to a new home. She said that she "love[s]" the child and that the child is bonded with her.

{¶26} The foster care caseworker, Sabrina Buchanan, testified that she visited the foster home every month. She explained that "[i]t is rare even during [her] short visits to the home that" she does not observe a tantrum. During her visits, the child has hit and kicked her, slammed doors, and hurt the other children. An individual from Journey Home works with the foster mother to give her ideas for managing the child's behaviors. The foster parents provide "a lot of structure" and the "same routine" for the child, which seems to help.

{¶27} The child receives therapy at Mid-Ohio Behavioral Health and has been diagnosed with Oppositional Defiant Disorder.  He started taking medication for his behavior, and it seemed to work for about two weeks.  However, the child currently is waiting to be evaluated to see if the dosage should be increased.  The child also has been on a waiting list to be evaluated for autism and will continue to need ongoing care.

{¶28} Linda Copeland testified on behalf of the mother.  She works for Integrated Services and started working with the parents in April 2022.  Copeland visits the parents' home about every other day and talks to them almost every day.  She helps the parents "with their anger, budgeting, just anything."

{¶29} Copeland observed four visits between the parents and the child.  She reported that the mother's "parenting is very good" and that the mother is capable of parenting the child.  Copeland also stated that the parents have made their home safer by placing safety locks on every door.  She has not noticed any major cleanliness issues, and the parents have improved their ability to manage the cat litter.  During her visits to the parents' home, she did not observe hazardous items located in places where the child could reach them.

{¶30} Brad Seevers, another Integrated Services worker, stated that he started working with the parents in late 2021.  He visits the parents' home at least once per week and talks to the parents nearly every day.  Seevers has found that the

parents are able to maintain a clean home, and he helped the parents lock up hazardous items like kitchen knives and lighters.

{¶31} Seevers observed two visits between the parents and the child and reported that their interaction was "great," i.e., the parents were engaged with the child.

{¶32} The maternal grandmother testified that the mother is capable of caring for the child. The mother testified and likewise stated that she can provide proper care for the child.

{¶33} The child's guardian ad litem stated that the parents have made progress. He nevertheless recommended that the court grant the agency permanent custody of the child. The guardian ad litem explained that the agency had worked with the parents for nearly two years and repeatedly emphasized the importance of keeping hazardous items out of the child's reach, yet the first overnight visit ended with a bottle of medication being left in a location where the child could have reached it.

{¶34} The guardian ad litem spoke with the child, and the child indicated that he would like to return home. However, the child was "unable to state a reason as to why he wants to go home other than he likes his parents' cats." The guardian ad litem does not believe that the child possesses the maturity to articulate "a reasoned position about support and structure and all the things that are at issue

in this case." He stated that the child needs "a home where he's going to get the structure, reinforcement, assistance that he needs on a minute by minute basis, not just a daily basis."

{¶35} On March 28, 2023, the trial court granted the agency permanent custody of the child. The court found that the child has been in the agency's temporary custody for 12 or more months of a consecutive 22-month period and that placing the child in the agency's permanent custody is in the child's best interest. With respect to the child's best interest, the court noted that the caseworker testified that even though "the parents have made great improvements to better themselves and their home," the child still would be "in danger and could get hurt." The court found that the child is doing well in "foster care and has made great improvements." The child now is "verbal and potty trained." He receives counseling for behavioral and anger issues. The caseworker stated that "the child will require an ongoing high level care to deal with his special needs and issues."

{¶36} The court recognized that the child informed the guardian ad litem that he would like to return home and that the guardian ad litem recommended that the court place the child in the agency's permanent custody. The court noted that the guardian ad litem indicated that the parents are incapable "of taking care of the child without the continued and constant help of others, due to their own issues and

the child's issues." The guardian ad litem stated that "the child needs structure, reinforcement and assistance," which the parents are unable to provide.

{¶37} The court also pointed out that when the agency filed its permanent custody motion, the child had been in its temporary custody for more than 20 months and, by the time of the permanent custody hearing, he had been in the agency's temporary custody for more than two years.

{¶38} The court additionally found that the child needs a legally secure permanent placement and that he cannot attain this type of placement without granting the agency permanent custody. The court thus granted the agency permanent custody of the child. The parents' separate appeals followed.

## ASSIGNMENTS OF ERROR

### CASE NO. 23CA7

I.    THE JUVENILE COURT ERRED IN FINDING THAT
      PERMANENT CUSTODY WAS IN THE BEST INTEREST
      OF THE CHILD, WHEN THAT FINDING WAS NOT
      SUPPORTED BY SUFFICIENT EVIDENCE AND WAS
      AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

II.   RULE 48 WAS VIOLATED WHEN THE GAL DID NOT
      OBSERVE THE PARENT AND THE CHILD.

### CASE NO. 23CA8

I.    THE TRIAL COURT ERRED IN GRANTING PERMANENT
      CUSTODY TO THE AGENCY AND TERMINATING
      MOTHER'S PARENTAL RIGHTS BECAUSE THE TRIAL
      COURT'S JUDGMENT IS AGAINST THE MANIFEST
      WEIGHT OF THE EVIDENCE.

II.     THE TRIAL COURT ERRED WHEN IT FAILED TO
        APPOINT AN ATTORNEY TO REPRESENT THE CHILD
        AND THEREFORE THE TRIAL COURT'S JUDGMENT
        GRANTING PERMANENT CUSTODY TO THE AGENCY
        SHOULD BE REVERSED.

ASSIGNMENT OF ERROR I

{¶39} For ease of discussion, we have combined our review of the father's and the mother's first assignments of error.

{¶40} In his first assignment of error, the father argues that the trial court's decision to place the child in the agency's permanent custody is not supported by sufficient evidence and is against the manifest weight of the evidence. More particularly, he contends that the evidence fails to show that he would be unable to appropriately parent the child. Appellant asserts that he completed the case plan requirements and promptly remediated any hazards that the agency identified. He further claims that the evidence fails to support the trial court's finding that placing the child in the agency's permanent custody is in the child's best interest.

{¶41} In her first assignment of error, the mother similarly argues that the trial court's decision to grant the agency permanent custody of the child is against the manifest weight of the evidence. She asserts that the agency did not present clear and convincing evidence to establish that placing the child in its permanent custody is in the child's best interest. The mother contends that the parents share a strong and loving bond with the child and have demonstrated their commitment to

him by attending nearly all of their visitations and by working to improve not only their own lives but also the condition of their home. She additionally notes that the child's guardian ad litem stated that the child wishes to return to his parents' care.

{¶42} The mother also claims that although the child has been in the agency's temporary custody for more than 12 months, the agency's refusal to return the child to the parents' care was based upon "unfounded and unreasonable fears and speculation." She further faults the agency for summarily dismissing the maternal grandmother as a placement.

{¶43} The mother next argues that the evidence fails to support the court's finding that the child needs a legally secure permanent placement and that he cannot achieve this type of placement without granting the agency permanent custody. She claims that the trial court's finding that the parents failed to maintain safe, stable, and clean housing is contrary to the evidence presented at the hearing. The mother asserts that the agency appeared to hinge its decision to seek permanent custody on the father's "singular error" in failing to secure prescription medicine. The mother further argues that although the trial court recited the guardian ad litem's statement that the child needs structure, reinforcement, and assistance, none of the evidence presented at the hearing "explained what assistance the Child actually needs." She contends that the evidence supports a

finding that the parents are able to provide the child with "an adequate permanent home."

{¶44} The mother additionally faults the trial court for seeming to rely upon any cognitive delays that caused the court and the guardian ad litem concern. In sum, the mother alleges that the trial court's best interest findings "are unsupported conclusory statements."

## STANDARD OF REVIEW

{¶45} A reviewing court generally will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. *See In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 53 (4th Dist.). When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court " ' " 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " ' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶46} In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43. In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *R.M.* at ¶ 55.

{¶47} Once the reviewing court finishes its examination, the court may reverse the judgment only if it appears that the factfinder, when resolving the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175. A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the [decision].' " *Id.*, quoting *Martin* at 175.

{¶48} Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997); *accord In re Christian,* 4th Dist. Athens No. 04CA10, 2004-Ohio-3146, ¶ 7.  As the Ohio Supreme Court long ago explained:

> In proceedings involving the custody and welfare of children the power of the trial court to exercise discretion is peculiarly important.  The knowledge obtained through contact with and observation of the parties and through independent investigation can not be conveyed to a reviewing court by printed record.

*Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952).

{¶49} Furthermore, in a permanent custody case, a trial court judge may have had significant contact with the parties before a permanent custody motion is even filed.  Thus, "it is not unreasonable to presume that the trial court judge had far more opportunities to evaluate the credibility, demeanor, attitude, etc., of the parties than this court ever could from a mere reading of the permanent custody hearing transcript." *In re K.W.*, 2018-Ohio-1933, 111 N.E.3d 368, ¶ 30 (4th Dist.).

PERMANENT CUSTODY FRAMEWORK

{¶50} R.C. 2151.414(B)(1) specifies that a trial court may grant a children services agency permanent custody of a child if the court finds, by clear and

convincing evidence, that (1) the child's best interest would be served by the award

of permanent custody, and (2) any of the following conditions applies:

>    (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>    (b) The child is abandoned.
>    (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>    (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.
>    (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶51} In the case at bar, the trial court found that R.C. 2151.414(B)(1)(d)

applies.[1]  Neither the father nor the mother has challenged this finding.  Instead,

the father argues that R.C. 2151.414 requires a trial court "to find by clear and

---

[1] We observe that the trial court's decision appears to contain a typographical error.  The court recited the substance of R.C. 2151.414(B)(1)(d), but it cited to R.C. 2151.414(B)(1)(c).

convincing evidence * * * that the child cannot be placed with either parent within a reasonable period of time." As we have noted in previous cases, however, "R.C. 2151.414(B)(1)(a), by its terms, is inapplicable when a child has been in a children services agency's temporary custody for 12 or more months of a consecutive 22-month period." *In re S.W.*, 2023-Ohio-793, 210 N.E.3d 36, ¶ 31. Therefore, the court was not required to consider whether the child cannot be placed with either parent within a reasonable time in accordance with R.C. 2151.414(B)(1)(a). *E.g., In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 21. Accordingly, once the court found that R.C. 2151.414(B)(1)(d) applied, the statute authorized the court to grant the agency permanent custody of the child so long as the court determined, by clear and convincing evidence, that placing the child in the agency's permanent custody is in his best interest.

{¶52} R.C. 2151.414(D)(1) requires a trial court to consider all relevant, as well as specific, factors to determine whether a child's best interest will be served by granting a children services agency permanent custody. The specific factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally

secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

{¶53} Determining whether granting permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "all relevant [best interest] factors," as well as the "five enumerated statutory factors." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56; *accord In re C.G.*, 9th Dist. Summit Nos. 24097 and 24099, 2008-Ohio-3773, ¶ 28; *In re N.W.*, 10th Dist. Franklin Nos. 07AP-590 and 07AP-591, 2008-Ohio-297, ¶ 19. However, none of the best interest factors requires a court to give it "greater weight or heightened significance." *C.F.* at ¶ 57. Instead, the trial court considers the totality of the circumstances when making its best interest determination. *In re K.M.S.*, 3d Dist. Marion Nos. 9-15-37, 9-15-38, and 9-15-39, 2017-Ohio-142, ¶ 24; *In re A.C.*, 9th Dist. Summit No. 27328, 2014-Ohio-4918, ¶ 46. In general, "[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security." *In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, ¶ 66, citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991).

{¶54} In the case at bar, we do not believe that the trial court's best interest determination is against the manifest weight of the evidence. The agency presented substantial clear and convincing evidence that placing the child in its permanent custody would serve the child's best interest.

Child's Interactions and Interrelationships

{¶55} The evidence shows that the parents adore their child and have attended a remarkable 102 out of 104 visits. By all accounts, the parents share a bond with their child. However, when the agency removed the child from the home, he was nonverbal and not potty trained. He also had boils and rashes from wearing his diapers for too long, and his skin had a soaked-in smell that took about two weeks to dissipate. This evidence suggests that the parents had not been providing the child with a level of interaction that would help the child develop age-appropriate skills. Additionally, the agency had responded to the home due to reports of domestic violence, which means that the parents exposed the child to violent behavior. Thus, although the parents deeply love their child, the interactions that the child had while in their home indicate that the parents have not always been able to protect the child from physical, mental, and emotional harm.

{¶56} The evidence also shows that during some of the parents' visits with the child, the father and the child fought over toys, and during other visits, the father ate some of the child's food. These behaviors caused the child and the

father to become upset. This evidence illustrates that not all of the parents'

interactions with the child have been positive experiences.

{¶57} The evidence indicates that the foster mother deeply cares for the

child and provides him with structure and routine to help manage his behavioral

issues.

## Child's Wishes

{¶58} The guardian ad litem stated that the child expressed a desire to return

home. However, the guardian ad litem clarified that he was uncertain whether the

child possessed the maturity to accurately convey his wishes. The guardian ad

litem noted that the child made the statement in reference to the family's cat.

{¶59} The guardian ad litem recommended that the court grant the agency

permanent custody of the child. *See, e.g., In re I.A.-W.*, 8th Dist. Cuyahoga No.

111217, 2022-Ohio-1766, ¶ 37; *In re S.M.*, 4th Dist. Highland No. 14CA4, 2014-

Ohio-2961, ¶ 32 (both recognizing that R.C. 2151.414 permits juvenile courts to

consider a child's wishes as child directly expresses or through the guardian ad

litem).

## Custodial History

{¶60} The child has been in the agency's temporary custody since he was

five years old and has remained in the same foster home throughout the case. The

child also has been in the agency's temporary custody for well over 12 months out of a consecutive 22-month period.

Legally Secure Permanent Placement

{¶61} "Although the Ohio Revised Code does not define the term 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56, citing *In re Dyal*, 4th Dist. Hocking No. 01CA12, *9 (Aug. 9, 2001) (implying that "legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In re K.M.*, 10th Dist. Franklin Nos. 15AP-64 and 15AP-66, 2015-Ohio-4682, ¶ 28 (observing that legally secure permanent placement requires more than stable home and income but also requires environment that will provide for child's needs); *In re J.H.*, 11th Dist. Lake No. 2012-L-126, 2013-Ohio-1293, ¶ 95 (stating that mother unable to provide legally secure permanent placement when she lacked physical and emotional stability and that father unable to do so when he lacked grasp of parenting concepts); *In re J.W.*, 171 Ohio App.3d 248, 2007-Ohio-2007, 870 N.E.2d 245, ¶ 34 (10th Dist.) (Sadler, J., dissenting) (stating that a legally secure permanent placement means "a placement that is stable and consistent"); Black's Law Dictionary 1354 (6th Ed. 1990) (defining "secure" to mean, in part, "not exposed to danger; safe; so strong, stable or firm as to insure safety"); *Id.* at

1139 (defining "permanent" to mean, in part, "[c]ontinuing or enduring in the same state, status, place, or the like without fundamental or marked change, not subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient"). Thus, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *M.B.* at ¶ 56.

{¶62} Moreover, a trial court that is evaluating a child's need for a legally secure permanent placement, and whether the child can achieve that type of placement, need not determine that terminating parental rights is "not only a necessary option, but also the only option." *Schaefer* at ¶ 64. Rather, once a court finds the existence of any one of the R.C. 2151.414(B)(1)(a)-(e) factors, R.C. 2151.414(D)(1) requires the court to weigh "all the relevant factors * * * to find the best option for the child." *Id.* "The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *Id.* Instead, as we recognized earlier, a child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security. *C.B.C.* at ¶ 66.

{¶63} In the case before us, the evidence shows that placing the child in the agency's permanent custody will foster his growth, stability, and security. Throughout the agency's involvement, the parents displayed difficulty maintaining their home so that it continuously would be free of items hazardous to a young, high-energy child who displays behavioral issues. The agency worked with the family to alleviate this concern and even progressed to an overnight visit. Unfortunately, when the caseworker returned in the morning to retrieve the child, the caseworker discovered a medication bottle within the child's reach. She explained that the parents had this recurring problem of being unable to consistently maintain the home environment so that it would be safe for the child to return. Thus, despite the parents' progress, the agency caseworkers continued to observe hazards in the home even after giving the parents approximately two years to show that they could maintain a home free from hazards. The parents did not establish that they would be able to consistently provide the child with a safe environment, and the agency remained fearful that returning the child to the parents' care could result in harm to the child.

{¶64} Plus, the child was nonverbal and not potty trained at five years of age, which raises questions whether the parents would be able to provide the child with a level of care that will help foster age-appropriate growth. Furthermore, the

father continued to have outbursts of anger, and the parents sometimes were "physically unsafe with each other."

{¶65} Although the parents presented evidence to show that they were able to maintain their home free of hazards, the trial court was free to weigh the testimony and could have determined that even if the parents sometimes were able to keep the home free from hazards, they were not consistently able to do so.

{¶66} We also recognize the evidence indicates that both parents have made significant strides to improve their lives and well-being and completed many of their case plan activities. As we have observed several times in the past, however, a parent's case plan compliance may be a relevant, but not necessarily a conclusive, factor when a court considers a permanent custody motion. *In re E.R.*, 4th Dist. Athens No. 22CA16, 2023-Ohio-1468, ¶ 45; *In re B.P.*, 4th Dist. Athens No. 20CA13, 2021-Ohio-3148, ¶ 57; *In re T.J.*, 4th Dist. Highland No. 2016-Ohio-163, ¶ 36, citing *In re R.L.*, 9th Dist. Summit Nos. 27214 and 27233, 2014-Ohio-3117, ¶ 34 ("although case plan compliance may be relevant to a trial court's best interest determination, it is not dispositive of it"); *In re S.C.*, 8th Dist. Cuyahoga No. 102349, 2015-Ohio-2280, ¶ 40 ("Compliance with a case plan is not, in and of itself, dispositive of the issue of reunification"); *accord In re K.M.*, 4th Dist. Ross No. 19CA3677, 2019-Ohio-4252, ¶ 70, citing *In re W.C.J.*, 4th Dist. Jackson No. 14CA3, 2014-Ohio-5841, ¶ 46 ("[s]ubstantial compliance with a case plan is not

necessarily dispositive on the issue of reunification and does not preclude a grant

of permanent custody to a children's services agency"); *In re N.L.*, 9th Dist.

Summit No. 27784, 2015-Ohio-4165, ¶ 35 ("substantial compliance with a case

plan, in and of itself, does not establish that a grant of permanent custody to an

agency is erroneous").  "Indeed, because the trial court's primary focus in a

permanent custody proceeding is the child's best interest, 'it is entirely possible

that a parent could complete all of his/her case plan goals and the trial court still

appropriately terminate his/her parental rights.' "  *W.C.J.* at ¶ 46, quoting *In re

Gomer*, 3d Dist. Wyandot Nos. 16-03-19, 16-03-20, and 16-03-21, 2004-Ohio-

1723, ¶ 36; *accord In re K.J.*, 4th Dist. Athens No. 08CA14, 2008-Ohio-5227, ¶ 24

("when considering a R.C. 2151.414(D)(1)(d) permanent custody motion, the focus

is upon the child's best interests, not upon the parent's compliance with the case

plan").  Thus, a parent's case plan compliance will not preclude a trial court from

awarding permanent custody to a children services agency when doing so is in the

child's best interest.  *Id.*  Consequently, even though the parents have made

significant improvements in their lives, those improvements do not override the

child's best interest.

{¶67} The mother additionally alleges that the agency should have

considered whether the maternal grandmother would be an appropriate placement

for the child.  The record indicates that early in the case, the maternal grandmother

asked the agency about obtaining custody of the child. The agency advised the grandmother that she would not pass the home study, and the grandmother did not further pursue her request. Nothing in the record indicates that the maternal grandmother filed a motion for legal custody of the child. We also observe that courts are not required to favor relative placement if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody. *In re M.H.*, 4th Dist. Pike No. 17CA882, 2017-Ohio-7365, ¶ 116; *In re T.G.,* 4th Dist. Athens No. 15CA24, 2015–Ohio–5330, ¶ 24; *In re V.C.,* 8th Dist. Cuyahoga No. 102903, 2015–Ohio–4991, ¶ 61 (stating that relative's positive relationship with child and willingness to provide an appropriate home did not trump child's best interest). Moreover, "[i]f permanent custody is in the child's best interest, legal custody or placement with [a parent or other relative] necessarily is not." *In re K.M.,* 9th Dist. Medina No. 14CA0025–M, 2014–Ohio–4268, ¶ 9. Here, the trial court determined that placing the child in the agency's permanent custody is in his best interest. Thus, placing him in the maternal grandmother's legal custody necessarily is not.

{¶68} The mother further charges that the trial court based its decision to grant the agency permanent custody based solely upon her limited cognitive abilities. To support this argument, the mother relies on *In re D.A.,* 113 Ohio St.3d 88, 2007–Ohio–1105, 862 N.E.2d 829.

{¶69} In *D.A.*, the Ohio Supreme Court held that a trial court may not base its best interest determination "solely on the limited cognitive abilities of the parents." *Id.* at syllabus. In that case, the trial court "found that, although [the parents] love their son very much and were willing to do anything necessary to bring him home, returning D.A. to them was not in his best interest, because they have 'very low cognitive skills that hinder their day to day functioning' and 'demonstrate no ability to engage in the type of complex thinking necessary to parent a child.' " *Id.* at ¶ 5.

{¶70} The trial court additionally "expressed its concern that [the parents] function as the child's peers instead of as his parents" and determined that allowing " 'a normally functioning child like [D.A.] to be parented by two parents with the severe limitations demonstrated by [the parents] is to seriously jeopardize his healthy, successful future.' " *Id.* The trial court concluded that the child could not be placed with either parent within a reasonable time or should not be placed with either parent because the parents " 'have failed continually and repeatedly for a period of six months or more to substantially remedy the conditions causing removal.' " *Id.* The trial court thus placed the child in the agency's permanent custody.

{¶71} The parents appealed the trial court's judgment, and the appellate court affirmed. On further appeal to the Ohio Supreme Court, the parents argued

that the trial court terminated their parental rights based solely upon "their limited cognitive abilities." *Id.* at ¶ 19. The parents asserted that "their low IQ scores were the only objective evidence to support a finding that D.A. could not or should not be placed with them and that it was in his best interest to terminate their parental rights."

{¶72} The Ohio Supreme Court agreed with the parents and concluded that the trial court had not applied the proper statutory factors before placing the child in the agency's permanent custody. The court noted that the trial court relied on R.C. 2151.414(E)(2), but it "did not find that [the parents] were unable to provide an adequate home for D.A. due to their mental retardation, a finding that is required to satisfy R.C. 2151.414(E)(2)."[2] *Id.* at ¶ 33.

{¶73} The court also determined that the trial court did not consider the appropriate best interest factors but, instead, "focused on [the] parents' limited cognitive abilities." *Id.* at ¶ 35. The court explained that the trial court should not have considered the parents' intellectual disability. Rather, "the court should have

---

[2] At the time of the *D.A.* court's decision, R.C. 2151.414(E)(2) stated that a trial court could find that a child cannot be placed with either parent within a reasonable time or should not be placed with either parent if it found the existence of "[c]hronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the [disposition] hearing * * *." *D.A.* at ¶ 23.

considered factors such as their relationship with their child, whether they had ever harmed him, and where the child wished to live." *Id.*, citing R.C. 2151.414(D). The court pointed out that "there was no evidence that [the parents] have harmed D.A. either physically, emotionally, or mentally." *Id.* at ¶ 36. Additionally, the evidence showed that the child "has done well in school, and his behavior is appropriate." *Id.*

{¶74} The court ultimately held: "when determining the best interest of a child under R.C. 2151.414(D) at a permanent-custody hearing, a trial court may not base its decision solely on the limited cognitive abilities of the parents." *Id.* The court recognized that other cases had upheld decisions that placed a child in an agency's permanent custody based upon a parent's intellectual disability. The court distinguished those cases by noting that "objective evidence existed to show that the statute was satisfied." *Id.*, citing *In re C.E.,* 12th Dist. Butler Nos. CA2006–01–015 and CA2006–02–024, 2006-Ohio-4827 (the mother needed constant supervision and prompting to meet child's basic needs and had inadequate housing); *In re King,* 5th Dist. Fairfield No. 05 CA 77, 2006-Ohio-781 (the mother consistently relied on others to meet many of her basic needs and lost her housing).

{¶75} *D.A.* does not control the outcome of the case before us. Instead, the trial court relied upon "objective evidence" to support its decision. It did not rely solely on the parents' limited cognitive abilities. In the previous paragraphs, we

outlined some of the facts that support the trial court's decision. And as we have noted in prior cases, a parent's cognitive abilities may be relevant to determining the child's best interests when "objective evidence" shows that a parent's "cognitive status impeded [the parents'] ability to care for [the] children in that [the parent was] unable to recognize or protect [the] children from harm." *In re M.N.*, 4th Dist. Athens No. 08CA9, 2008-Ohio-4821, ¶ 23.

{¶76} Here, as we discussed above, the agency presented objective evidence that the parents' cognitive status impedes their ability to care for the child and that they are unable to protect him from physical, emotional, or mental harm. Moreover, as in *C.E.* and *King*, the evidence here likewise shows that the parents need daily assistance meeting their own needs. Additionally, unlike the child in *D.A.*, who did not have behavioral issues, the child in the case before us displays difficult behavioral issues at home and at school. Thus, the trial court relied upon some facts, other than the parents' apparently limited cognitive abilities, to support its decision. Furthermore, the trial court considered the appropriate best interest factors, unlike the trial court in *D.A. See M.N.* at ¶ 23.

{¶77} To the extent the mother asserts that the trial court's decision is too conclusory, the Ohio Supreme Court has rejected the notion that a trial court must detail its findings regarding the best interest factors. *In re M.M.*, 4th Dist. Pike No. 20CA907, 2021-Ohio-2287, ¶ 50, citing *In re A.M.*, 166 Ohio St. 3d 127, 2020-

Ohio-5102, 184 N.E.3d 1, ¶ 31.  Instead, the *A.M.* court stated that the record simply must show that the trial court "considered" (i.e., reflected upon or thought about with a degree of care or caution) the best interest factors.  In the case before us, the record shows that the trial court considered the best interest factors.

{¶78} Accordingly, based upon all of the foregoing reasons, we overrule the father's and the mother's first assignments of error.

CASE NO. 23CA7

ASSIGNMENT OF ERROR II

{¶79} In his second assignment of error, the father asserts that the guardian ad litem did not comply with Sup.R. 48.03.  He contends that the guardian ad litem failed to observe the child with the parents and that this failure discredits the guardian ad litem's recommendation regarding the child's best interest.

{¶80} We initially observe that, during the trial court proceedings, the father did not assert that the guardian ad litem failed to comply with Sup.R. 48.03.  It is well-settled that a party may not raise new issues or legal theories for the first time on appeal.  *Stores Realty Co. v. Cleveland*, 41 Ohio St.2d 41, 43, 322 N.E.2d 629 (1975).  Thus, a litigant who fails to raise an argument before the trial court forfeits the right to raise that issue on appeal.  *Independence v. Office of the Cuyahoga Cty. Executive*, 142 Ohio St.3d 125, 2014-Ohio-4650, 28 N.E.3d 1182, ¶ 30 ("an appellant generally may not raise an argument on appeal that the appellant has not

raised in the lower courts"); *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 21 (defendant forfeited constitutional challenge by failing to raise it during trial court proceedings); *Gibson v. Meadow Gold Dairy*, 88 Ohio St.3d 201, 204, 724 N.E.2d 787 (2000) (party waived arguments for purposes of appeal when party failed to raise those arguments during trial court proceedings); *State ex rel. Gutierrez v. Trumbull Cty. Bd. of Elections*, 65 Ohio St.3d 175, 177, 602 N.E.2d 622 (1992) (appellant cannot "present * * * new arguments for the first time on appeal"); *accord State ex rel. Jeffers v. Athens Cty. Commrs.*, 4th Dist. Athens No. 15CA27, 2016-Ohio-8119, fn.3 ("[i]t is well-settled that failure to raise an argument in the trial court results in waiver of the argument for purposes of appeal"); *State v. Anderson*, 4th Dist. Washington No. 15CA28, 2016-Ohio-2704, ¶ 24 ("arguments not presented in the trial court are deemed to be waived and may not be raised for the first time on appeal").

{¶81} Appellate courts may, however, in certain circumstances, consider a forfeited argument using a plain error analysis. *E.g., State v. Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, ¶ 17 ("[a]n appellate court has discretion to notice plain error"); *Rosales-Mireles v. United States*, 585 U.S. ___, 138 S.Ct. 1897, 1904, 201 L.Ed.2d 376 (2018) (court has discretion to recognize plain error); *State v. Jones*, 7th Dist. No. 06-MA-109, 2008-Ohio-1541, ¶ 65 (the plain error doctrine "is a wholly discretionary doctrine"). For the plain error doctrine to

apply, the party claiming error must establish (1) that " 'an error, i.e., a deviation from a legal rule" occurred, (2) that the error was " 'an "obvious" defect in the trial proceedings,' " and (3) that this obvious error affected substantial rights, i.e., the error " 'must have affected the outcome of the trial.' " *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002); *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209, 436 N.E.2d 1001, 1003 (1982) ("A 'plain error' is obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse affect on the character and public confidence in judicial proceedings."). For an error to be "plain" or "obvious," the error must be plain "under current law" "at the time of appellate consideration." *Johnson v. United States*, 520 U.S. 461, 467, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); *accord Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240.

{¶82} The plain error doctrine is not, however, readily invoked in civil cases. Instead, an appellate court "must proceed with the utmost caution" when applying the plain error doctrine in civil cases. *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1997). The Ohio Supreme Court has set a "very high standard" for invoking the plain error doctrine in a civil case. *Perez v. Falls Financial, Inc.*, 87 Ohio St.3d 371, 721 N.E.2d 47 (2000). Thus, "the doctrine is sharply limited to the extremely rare case involving exceptional circumstances

where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss*, 79 Ohio St.3d at 122, 679 N.E.2d 1099; *accord Jones v. Cleveland Clinic Found.*, 161 Ohio St.3d 337, 2020-Ohio-3780, 163 N.E.3d 501, ¶ 24; *Gable v. Gates Mills*, 103 Ohio St.3d 449, 2004-Ohio-5719, 816 N.E.2d 1049, ¶ 43.  Moreover, appellate courts "should be hesitant to decide [forfeited errors] for the reason that justice is far better served when it has the benefit of briefing, arguing, and lower court consideration before making a final determination." *Sizemore v. Smith*, 6 Ohio St.3d 330, 332, 453 N.E.2d 632 (1983), fn. 2; *accord Mark v. Mellott Mfg. Co., Inc.*, 106 Ohio App.3d 571, 589, 666 N.E.2d 631 (4th Dist.1995) ("Litigants must not be permitted to hold their arguments in reserve for appeal, thus evading the trial court process.").  Additionally, "[t]he plain error doctrine should never be applied to reverse a civil judgment * * * to allow litigation of issues which could easily have been raised and determined in the initial trial." *Goldfuss*, 79 Ohio St.3d at 122.

{¶83} In the case sub judice, the father did not argue that the trial court obviously erred by considering the guardian ad litem's recommendation.  "We further point out that this court, along with other Ohio appellate courts, has refused to recognize purported [superintendence rule] violations as reversible error." *In re*

*A.P.*, 4th Dist. Gallia No. 21CA14, 2022-Ohio-1577, ¶ 46; e.g., *In re K.L.*, 11th Dist. Portage No. 2021-P-0022, 2021-Ohio-3080, ¶ 63 ("the failure to comply with the Rules of Superintendence, even if a technical error, is not reversible"); *In re E.W.*, 4th Dist. Washington No. 10CA18, 2011-Ohio-2123, ¶ 12 (superintendence rules are internal housekeeping rules that do not create any substantive rights); *Pettit v. Pettit*, 12th Dist. Fayette No. CA2011-08-018, 2012-Ohio-1801, ¶ 12 (superintendence rules are "administrative directives only, and are not intended to function as rules of practice and procedure"); *accord Gupta v. Sharan*, 10th Dist. Franklin No. 22AP-81, 2022-Ohio-4479, ¶ 44; *State v. Clark*, 9th Dist. Medina No. 20CA0020-M, 2021-Ohio-3397, ¶ 39; *State v. Klayman*, 4th Dist. Hocking No. 17CA13, 2018-Ohio-3580, ¶ 17; *see State ex rel. Parker Bey v. Byrd*, 160 Ohio St.3d 141, 2020-Ohio-2766, 154 N.E.3d 57, ¶ 41 (Kennedy, J., concurring in part and dissenting in part), quoting State v. *Singer*, 50 Ohio St.2d 103, 110, 362 N.E.2d 1216 (1977) (" '[t]he Rules of Superintendence are not designed to alter basic substantive rights' ").

{¶84} Moreover, the father has not shown that the result of the trial court proceedings would have been different if the guardian ad litem had observed the child with the parents. The father did not argue, for example, that if the guardian ad litem had observed the child with the parents, the trial court would have rejected the agency's permanent-custody motion. Consequently, we do not believe that the

father can establish that the trial court plainly erred by considering the guardian ad

litem's recommendation.

{¶85} Therefore, we overrule the father's second assignment of error.

CASE NUMBER 23CA8

ASSIGNMENT OF ERROR II

{¶86} In her second assignment of error, the mother asserts that the trial

court erred by failing to appoint an attorney to represent the child.  She contends

that the record establishes that the child's wishes conflicted with the guardian ad

litem's recommendation and that this conflict required the trial court to appoint

independent counsel to represent the child.

{¶87} We initially observe that the mother did not request the trial court to

appoint independent counsel for the child when she became aware that the child

had told the guardian ad litem that he would like to return home.  Therefore, the

mother failed to preserve the issue for purposes of appeal.  *In re B.J.L.*, 2019-Ohio-

555, 130 N.E.3d 906, ¶ 41 (4th Dist.), citing *In re C.B.*, 129 Ohio St.3d 231, 2011-

Ohio-2899, 951 N.E.2d 398, ¶ 18.  We nevertheless may review this assignment of

error for plain error.  *See Risner v. Ohio Dept. of Natural Resources, Ohio Div. of

Wildlife*, 144 Ohio St.3d 278, 2015-Ohio-3731, 42 N.E.3d 718, ¶ 27 (stating that

reviewing court has discretion to consider forfeited constitutional challenges).  As

we explain below, we do not believe that the trial court committed an error, plain

or otherwise, by failing to appoint—or by failing to inquire whether to appoint—independent counsel for the child.

{¶88} "[A] child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances." *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110, syllabus, citing R.C. 2151.352, Juv.R. 4(A), and Juv.R. 2(Y). *Williams* does not mandate that a child always have independent counsel in a juvenile court proceeding to terminate parental rights. Instead, a child is entitled to independent counsel in a parental-rights termination proceeding only when "certain circumstances" exist. *Id.*

{¶89} The *Williams* court did not explicitly explain the "certain circumstances" that would warrant the appointment of independent counsel. Instead, the court offered the following guidance for juvenile courts to follow when ascertaining if "certain circumstances" exist: "courts should make a determination, on a case-by-case basis, whether the child actually needs independent counsel, taking into account the maturity of the child and the possibility of the guardian ad litem being appointed to represent the child." *Id.* at ¶ 17. Furthermore, a juvenile court must appoint independent counsel for a child "when a guardian ad litem who is also appointed as the juvenile's attorney recommends a disposition that conflicts with the juvenile's wishes." *Id.* at ¶ 18.

{¶90} Consequently, a trial court ordinarily should appoint independent counsel for a child " 'when the child has consistently and repeatedly expressed a strong desire that differs and is otherwise inconsistent with the guardian ad litem's recommendations.' " *In re V.L.*, 12th Dist. Butler No. CA2016-03-045, 2016-Ohio-4898, ¶ 39, quoting *In re B.K.*, 12th Dist. Butler No. CA2010-12-324, 2011-Ohio-4470, ¶ 19; *accord In re Hilyard*, 4th Dist. Vinton Nos. 05CA600 through 05CA609, 2006-Ohio-1965, ¶ 36.  However, a trial court generally need not " 'consider the appointment of counsel based upon a child's occasional expression of a wish to be with a parent or because of a statement made by an immature child.' " *In re N.P.*, 2016-Ohio-3125, 65 N.E.3d 319 (11th Dist.), ¶ 14, quoting *In re Williams*, 11th Dist. Geauga Nos. 2002-G-2454, 2002-Ohio-6588, ¶ 24 (*Williams I*); *accord In re E.S.*, 2d Dist. Clark No. 2016-CA-36, 2017-Ohio-219, ¶ 49.

{¶91} In the case before us, "certain circumstances" do not exist.  The record does not show that the child consistently and repeatedly expressed a strong desire to live with his parents.  Rather, the record shows that on one occasion, the child told the guardian ad litem that he would like to return home.  The child's singular statement does not show that he consistently and repeatedly expressed a desire that conflicted with the guardian ad litem's recommendation.  *See In re V.L.* at ¶ 43 (concluding that foster mother's testimony that child talked about returning home, and caseworker's statement that early in the case, child asked "a lot" when she was

going home to her parents did not show that child "consistently and repeatedly" expressed a strong desire that conflicted with guardian ad litem's recommendation).

{¶92} The guardian ad litem's testimony further suggests that the child may not possess the maturity to accurately convey his wishes. The guardian ad litem explained that the child was "unable to state a reason as to why he wants to go home other than he likes his parents' cats." He further stated that he does not believe that the child is "old enough to come up with a reasoned position about support and structure and all the things that are at issue in this case to do that."

{¶93} Furthermore, any mandatory duty to investigate that might exist arises " 'when a child consistently expresses a desire to be with a parent.' " *Williams* at ¶ 6, quoting *Williams I*, 2002-Ohio-6588, at ¶ 26; *accord In re B.J.L.*, 2019-Ohio-555, 130 N.E.3d 906, ¶ 53 (4th Dist.). As we determined above, the child did not consistently express a desire to live with his parents. Thus, even if trial courts have a duty to investigate when a child consistently expresses a desire to be with a parent, that circumstance does not exist in the case at bar. Consequently, we do not agree with the mother that the trial court erred by failing to appoint independent counsel to represent the child.

{¶94} Accordingly, based upon the foregoing reasons, we overrule the mother's second assignment of error.

CONCLUSION

{¶95} Having overruled the father's and the mother's assignments of error,

we affirm the trial court's judgment.

**JUDGMENT AFFIRMED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED and costs be assessed to Appellants.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Hess, J., & Wilkin, J., Concur in Judgment and Opinion.


For the Court,


_____
Jason P. Smith
Presiding Judge


## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**