[Cite as *In re A.W.*, 2024-Ohio-2243.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HOCKING COUNTY

| | | |
|---|---|---|
| In the Matter of: | : | |
| | : | Case Nos. 23CA18 |
| A.W. and B.W. | : | 23CA19 |
| Adjudicated Dependent Children. | : | |
| | : | <u>DECISION AND JUDGMENT</u> |
| | : | <u>ENTRY</u> |
| | : | |
| | : | **RELEASED: 06/04/2024** |

_____
<u>APPEARANCES:</u>

L. Scott Petroff, Athens, Ohio, for appellant.

Alisa Turner, Hocking County Assistant Prosecutor, Logan, Ohio, for appellee.
_____

Wilkin, J.

{¶1} Appellant, Tasha Stevens, appeals a decision of the Hocking County Court of Common Pleas, Juvenile Division, that granted South-Central Ohio Job and Family Services, Children Services, ("the agency") permanent custody of her two children, A.W. and B.W. (ages four and five, respectively). Appellant raises two assignments of error. She first argues that the trial court's judgment granting the agency permanent custody of the children is against the manifest weight of the evidence. Next, appellant contends that the trial court plainly erred by failing to discharge the children's guardian ad litem (GAL) and to appoint a new GAL due to the GAL's alleged failure to comply with some of the duties listed in Sup.R. 48.03(D). After our review of the record and the applicable law, we do not find any merit to appellant's assignments of error. Therefore, we affirm the trial court's judgment.

FACTS AND PROCEDURAL BACKGROUND

{¶2} On July 28, 2020, the agency filed complaints that alleged A.W. (then, one year of age) is neglected and dependent and B.W. (then, two years of age) is a dependent child. The agency later filed amended complaints that alleged both children are dependent children and that revised the factual allegations of the original complaint. The amended complaints alleged the following facts. On July 25, 2020, law enforcement officers responded to the family's home after receiving a report regarding a medical emergency involving an infant. When one of the officers held the baby, the officer noted that she "was pale, not breathing, and seemed lifeless." A person at the scene reported that the baby "drowned in the tub." The officer resuscitated the baby and transported her to the hospital. Upon examination, medical personnel observed four "bruises the size of a dime across her forehead." Appellant reported that as she was washing the baby's hair, water entered her mouth. The baby "started to have breathing issues and then she stopped breathing."

{¶3} The baby's father stated that he was unaware that she was in the bathtub. He stated that appellant had been "giving the baby a bath and walked away" to enter the bedroom. The father "then heard screaming and they ran into the bathroom." The "tub was overflowing and water was going everywhere."

{¶4} The baby had to be life-flighted to Nationwide Children's Hospital in Columbus because she "was showing signs of possible brain damage and she was throwing up copious amounts of water." The hospital reported that the incident "was a

near drowning due to neglect and lack of supervision."  Fortunately, the baby[1] "has

improved" and "appears to be doing well."

{¶5} Appellant has a history with the agency and "struggles to care for 7 children

on her own."  The agency requested the court to grant it an order of protective

supervision or to place the children in its temporary custody.

{¶6} The trial court subsequently adjudicated the children dependent and placed

them in the agency's temporary custody.

{¶7} In January 2022, appellant was sentenced to serve a prison term for child

endangerment.

{¶8} On July 5, 2023, the agency filed separate motions that requested

permanent custody of the children.  The agency alleged that the children have been in

its temporary custody for 12 or more months of a consecutive 22-month period and that

placing the children in its permanent custody is in their best interest.

{¶9} On October 3, 2023, the trial court held a hearing to consider the agency's

permanent custody motions.  Caseworker Jamie Taylor testified as follows.  She was

the family's caseworker from January 2021, through June 2022.  The agency initially

became involved due to "the near fatality."  The family's case "was a difficult case to

work," because "[t]he parents were cooperative then not cooperative.  Cooperative and

not cooperative.  So there was a lot of that kind of thing throughout the case."

---

[1] The closing paragraph of the factual allegations indicate that A.W. is the child who nearly drowned. However, some testimony was presented at the permanent custody hearing that B.W. is the child who nearly drowned.  The trial court found that appellant had been incarcerated for a child endangering offense involving A.W.  Given the lack of clarity, this part of the opinion recounting the factual allegations of the complaint refrains from identifying the child involved in the incident.

{¶10} When Taylor first became involved with the family, the parents lived together and had appropriate housing. Taylor, however, had concerns about the parents' relationship. "It was on again, off again throughout the life of the case." Additionally, the near fatality occurred because the parents "were fighting at the time that * * * the bathtub was running and [the child] was in the bathtub." Moreover, even though the parents completed parenting classes, "there was little behavior change" and "no accountability for what happened."

{¶11} Taylor further indicated that the parents did not prioritize their children. As one example, the father did not visit the children while appellant was incarcerated "because it wasn't fair that [appellant] wasn't also receiving visits." Taylor also reported an incident between the parents that occurred as appellant prepared to give birth to her eighth child. The night before she was to be induced, the father left and stated "that he was not the father." Thus, appellant "was at the hospital by herself being induced and laboring." "[T]he whole time at the hospital while she was having the baby it was about [the father] and * * * their relationship."

{¶12} On cross-examination, Taylor did not agree that the parents substantially complied with their case plan. She explained that "even though they had parenting classes and they had housing, it was not stable and there was no behavior change." She "still did not see that their priority was the children over relationship or other things." The parents did not have stable housing, and "it was just continual chaos."

{¶13} Marni Tucker testified as follows. She was the family's caseworker from July 2020, through January 2021, and then again from June 2022, through July 2023. Although the parents were "checking off boxes," they did not change their behaviors.

The father "was very argumentative."  Tucker talked to appellant and told her that she was "not going to talk to [appellant] as long as [the father is] yelling and screaming at [Tucker]."

{¶14} Appellant has eight biological children, and she does not have custody of any of them.  Several are placed in the legal custody of others.  One is placed in a group home.

{¶15} The father did not visit the children.  He did not think that visiting them would be fair when appellant remained incarcerated and unable to visit them—an indication to Tucker that he does not prioritize the children.  The parents did call the children at the foster home.  However, neither parent has visited the children in about two years.

{¶16} Elizabeth Gura, the family's current caseworker, testified that appellant had been released from prison a couple of weeks earlier.  She explained that appellant had been sent to prison for child endangerment as a result of the near fatality.

{¶17} Cameron Weaver, the children's GAL, testified as follows.  He has been the GAL for over three years.  He did not believe that the children were mature enough "to give any kind of reasonable or logical conclusion as to what would be in their best interest."

{¶18} The GAL was "involved in the permanency hearings for all of the other children of the parents."  Neither parent attended those hearings.  Appellant had been incarcerated at the time.  The GAL did not have any communication with appellant while she was incarcerated.

{¶19} Once appellant entered prison, the father's contact with the GAL "completely ceased." Before appellant entered prison, the father seemed to make "a genuine effort to reunify," but once appellant went to prison, the father "just kind of went MIA," and the GAL "never heard anything else from him for a very long time." The GAL tried calling several phone numbers but was unable to reach the father until late August 2023. At that point, he scheduled a home visit with the father. The father was living in an apartment with a friend, and "the bedroom was the living room." This residence had "the bare necessities," but it did not have "any kind of clothing or bedding that would've been suitable for a child that's four or five years old." Moreover, it did not appear to be large enough to accommodate two small children.

{¶20} The GAL stated that he saw "a genuine desire from both parties to have some kind of relationship with the [children]." More recently, the father seemed "sincere in his conviction for wanting reunification." The GAL nevertheless believes that placing the children in the agency's permanent custody is in their best interests. The children have been with the same foster parent since their initial removal, and they seem "safe, happy, [and] bonded with [the] foster [parent]."

{¶21} The father testified as follows. The agency did not give him "the requisite assistance to help" him "reunify with" the children. The caseworkers were "[a]lways rude, disruptive towards [him] and they wondered why [he] would come back at them rude." He and appellant "took matters into [their] own hands" by "getting into counseling and parenting classes way before the case plan was even written out." He has "[b]een through counseling five different times" and completed it, along with anger management. He has learned coping mechanisms. Both he and appellant have "the

skills" and "the wherewithal to adequately parent" the children. The parents are living in a different residence than the one that the GAL visited, and they have the children's furnishings located in a storage unit.

{¶22} On cross-examination, the father explained that he did not visit the children while appellant was incarcerated because he did not want the children asking him "questions where their mom was at." He did not believe that it was fair to appellant to visit the children without her.

{¶23} Appellant testified that she went to prison in January 2022, and was released on October 11, 2023. She participated in various programs while in prison. She and the father currently live with a third individual, which has been "very stressful" because this person has been "in [the parents'] relationship trying to cause things." Appellant believes that she has the resources and ability to provide proper care for the children.

{¶24} On October 31, 2023, the trial court granted the agency permanent custody of the children. The court found that the children have been in the agency's temporary custody for 12 or more months of a consecutive 22-month period and that placing them in the agency's permanent custody is in their best interest. With respect to the children's best interests, the court found as follows: (1) the children's interrelationships with appellant and the father are "negligible"; (2) between January 2022, and October 11, 2023, appellant had been incarcerated for a child endangering offense involving A.W.; (3) neither parent has visited the children in person "since before January 2022"; (4) the children are too young to express their wishes; (5) the children have been in the agency's temporary custody since the summer of 2020; (6)

the children need a legally secure permanent placement and cannot achieve this type of placement without granting the agency permanent custody of the children; and (7) the children lack "a parental bond" with appellant and the father.  The court thus granted the agency permanent custody of the children.  This appeal followed.

## ASSIGNMENTS OF ERROR

I.     THE COURT COMMITTED REVERSIBLE ERROR WHEN IT TERMINATED THE PARENTAL RIGHTS OF APPELLANT BECAUSE THE DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

II.    THE TRIAL COURT PLAINLY ERRED WHEN IT FAILED TO COMPLY WITH R.C. 2151.281(D) AND (I) GIVEN THE NONCOMPLIANCE WITH THE DUTIES OF THE GUARDIAN AD LITEM.

## ASSIGNMENT OF ERROR I

{¶25} In her first assignment of error, appellant argues that the trial court's decision to award the agency permanent custody of the children is against the manifest weight of the evidence.  More particularly, appellant asserts that the trial court improperly applied the best interest factors by failing to consider whether any R.C. 2151.414(E)(7)-(11) factors applied.  She further claims that the evidence fails to support the court's finding that "permanent removal from [the] parents was in the best interest of the child[ren]."

## STANDARD OF REVIEW

{¶26} Generally, a reviewing court will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. *E.g., In re B.E.*, 4th Dist. Highland No. 13CA26, 2014-Ohio-3178, ¶ 27; *In re R.S.*, 4th Dist. Highland No. 13CA22, 2013-Ohio-5569, ¶ 29; *accord In re Z.C.*, 173 Ohio St.3d

359, 2023-Ohio-4703, ___ N.E.3d ___, ¶ 1.  When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court " ' "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." ' "  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist. 2001), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).  We further observe, however, that issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact.  As the court explained in *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984):  "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."  Moreover, deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evident in the parties' demeanor and attitude that does not translate to the record well."  *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997); *accord In re Christian*, 4th Dist. Athens No. 04CA10, 2004-Ohio-3146, ¶ 7.

{¶27} The question that an appellate court must resolve when reviewing a permanent custody decision under the manifest-weight-of-the-evidence standard is

"whether the juvenile court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43. "Clear and convincing evidence" is:

> the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*In re Estate of Haynes*, 25 Ohio St.3d 101, 103-04, 495 N.E.2d 23 (1986).

**{¶28}** In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990); *accord In re Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), citing *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954) ("Once the clear and convincing standard has been met to the satisfaction of the [trial] court, the reviewing court must examine the record and determine if the trier of fact had sufficient evidence before it to satisfy this burden of proof.").

**{¶29}** Thus, if a children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence. *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 62 (4th Dist.); *In re R.L.*, 2d Dist. Greene Nos. 2012CA32 and 2012CA33, 2012-Ohio-6049, ¶ 17, quoting *In re A.U.*, 2d Dist. Montgomery No. 22287, 2008-Ohio-187, ¶ 9 ("A reviewing court will not overturn a court's grant of permanent custody to the state as being contrary to the

manifest weight of the evidence 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements * * * have been established.' "). A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the [decision].' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

## PERMANENT CUSTODY PROCEDURE

{¶30} Before a court may award a children services agency permanent custody of a child, R.C. 2151.414(A)(1) requires the court to hold a hearing. The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. R.C. 2151.414(A)(1). Additionally, when considering whether to grant a children services agency permanent custody, a trial court should consider the underlying purposes of R.C. Chapter 2151: "to care for and protect children, 'whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety.' " *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 29, quoting R.C. 2151.01(A).

## R.C. 2151.414(B)

{¶31} R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing

evidence, that the child's best interest would be served by the award of permanent custody and, as relevant here, one of the following circumstances applies:

> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

{¶32} In the case before us, appellant does not dispute the trial court's finding that the children have been in the agency's temporary custody for 12 or more months of a consecutive 22-month period.  Therefore, we do not address this factor.

BEST INTEREST

{¶33} R.C. 2151.414(D) directs a trial court to consider "all relevant factors," as well as specific factors, to determine whether a child's best interest will be served by granting a children services agency permanent custody.  The following are the specific factors:  (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's GAL, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.

{¶34} Deciding whether a grant of permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "all relevant [best interest] factors," as well as the "five enumerated statutory factors."  *C.F.* at ¶ 57,

citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.

However, none of the best interest factors requires a court to give it "greater weight or

heightened significance." *Id.* Instead, the trial court considers the totality of the

circumstances when making its best interest determination. *In re K.M.S.*, 3d Dist.

Marion Nos. 9-15-37, 9-15-38, and 9-15-39, 2017-Ohio-142, ¶ 24; *In re A.C.*, 9th Dist.

Summit No. 27328, 2014-Ohio-4918, ¶ 46. In general, "[a] child's best interest is served

by placing the child in a permanent situation that fosters growth, stability, and security."

*In re C.B.C.*, 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, ¶ 66, citing

*In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991).

**{¶35}** Certainly, "the best practice is for the juvenile court to specifically address

each factor" listed in R.C. 2151.414(D). *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-

5102, 184 N.E.3d 1, ¶ 32. However, so long as the record indicates that the trial court

considered the best interest factors, no prejudicial error occurs. *Id.* at ¶ 36. As the *A.M.*

court explained,

> R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires. Although a reviewing court must be able to discern from the magistrate's or juvenile court's decision and the court's judgment entry that the court satisfied the statutory requirement that it consider the enumerated factors, we may not graft onto the statute a requirement that the court include in its decision a written discussion of or express findings regarding each of the best-interest factors.

*Id.* at ¶ 31.

**{¶36}** In the case at bar, as we explain below, we do not agree with appellant

that the trial court's best interest determination is against the manifest weight of the

evidence.

Children's Interactions and Interrelationships

**{¶37}**  Appellant asserts that the evidence regarding this factor does not weigh in favor of granting the agency permanent custody.  She recognizes that the GAL reported that the children share a bond with the foster parent and that the trial court described the children's relationship with appellant as "negligible."  Appellant contends, however, that the court did not find that the children's bonds to the foster parent were "greater than the bonds to their parents."  She further points out that the foster parent stated that she can only continue to care for the children until the agency finds a permanent placement.[2]

**{¶38}** We do not agree with appellant's analysis.  First, the trial court did not find that the children share a bond with appellant.  Instead, it found that "the interrelationship" between the children and their mother is "negligible."  The court additionally stated, in its discussion of the children's need for a legally secure permanent placement, that the children "lack * * * a parental bond" with appellant.  Therefore, appellant's assertion that the trial court found that "bonds still exist between" the children and appellant is without merit.

**{¶39}** Furthermore, even if the foster parent stated that she will continue to provide care for the children only until the agency finds a permanent family, her statement does not mean that the children lack a positive relationship with the foster parent.  Instead, this statement indicates that at some point, the children may need to transition to a new, permanent placement.

---

[2] This statement allegedly appears in the GAL's report.  However, the GAL's report is not part of the record transmitted on appeal.

**{¶40}** For these reasons, we do not agree with appellant that the evidence regarding the children's interactions and interrelationships weighs against granting the agency permanent custody of the children.

## Children's Wishes

**{¶41}** Appellant does not specifically challenge the court's finding regarding this factor. We note that the GAL recommended that the court grant the agency permanent custody of the children. *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 55 (R.C. 2151.414 "unambiguously gives the trial court the choice of considering the child's wishes directly from the child or through the guardian ad litem"); *In re S.M.,* 4th Dist. Highland No. 14CA4, 2014-Ohio-2961, ¶ 32 (recognizing that R.C. 2151.414 permits juvenile courts to consider a child's wishes as the child directly expresses or through the GAL).

## Custodial History

**{¶42}** Appellant does not challenge the court's findings regarding the children's custodial history. We observe that the evidence shows at the time of the permanent custody hearing, the children had been in the agency's temporary custody for the majority of their young lives. B.W. entered the agency's temporary custody when she was two years of age, and A.W. entered the agency's temporary custody when she was one year of age. At the time of the permanent custody hearing, the children were ages five and four, respectively.

## Legally Secure Permanent Placement

**{¶43}** Appellant asserts that both she and the children's father complied with the case plan and have resolved the issue that initially led to the children's removal. She

also contends that the children could have been placed with the father.  We do not agree with appellant that this factor weighs against granting the agency permanent custody.

**{¶44}** "Although the Ohio Revised Code does not define the term, 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met."  *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56, citing *In re Dyal*, 4th Dist. Hocking No. 01CA12, 2001 WL 925423, *9 (Aug. 9, 2001) (implying that "legally secure permanent placement" means a "stable, safe, and nurturing environment"); *see also In re K.M.*, 10th Dist. Franklin Nos. 15AP-64 and 15AP-66, 2015-Ohio-4682, ¶ 28 (observing that legally secure permanent placement requires more than a stable home and income but also requires an environment that will provide for the child's needs); *In re J.H.*, 11th Dist. Lake No. 2012-L-126, 2013-Ohio-1293, ¶ 95 (stating that the mother was unable to provide a legally secure permanent placement when she lacked physical and emotional stability and that the father was unable to do so when he lacked a grasp of parenting concepts).  Thus, "[a] legally secure permanent placement is more than a house with four walls.  Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs."  *In re M.B.* at ¶ 56.

**{¶45}** In the case at bar, appellant had been released from prison a few weeks before the permanent custody hearing and was living with the father and another individual.  Appellant indicated that this other individual had been creating some turmoil between her and the father.

{¶46} Before appellant was released from prison, the GAL had visited the apartment where the father was residing. He stated that it did not have suitable furnishings for young children. The GAL further explained that the father had been absent from the children's lives while appellant was in prison. The father had stated that he did not think that visiting the children without appellant would be "fair." Thus, the lack of appropriate furnishings for young children, combined with the father's nonchalance about visiting his children while appellant was incarcerated, support a finding that the father cannot provide the children with a safe, stable, and consistent environment where the children's needs will be met.

{¶47} Although appellant stated that she was working on obtaining her own place to live, at the time of the permanent custody hearing, she did not have independent housing. Moreover, appellant had been convicted of child endangerment, and the agency continued to have concerns regarding appellant's ability to properly supervise her children and her relationship with the children's father. Thus, neither of the children can be placed in appellant's custody, and they desperately need "stability and security * * * to become productive and well-adjusted members of the adult community." *Ridenour*, 61 Ohio St.3d at 324. Their best interests will be "served by placing them in a permanent situation that fosters growth, stability, and security." *C.B.C.* at ¶ 66, citing *Ridenour*. Thus, this factor weighs in favor of granting the agency permanent custody.

R.C. 2151.414(E)(7) THROUGH (11)

{¶48} Appellant also contends that the trial court's judgment is against the manifest weight of the evidence because the court "did not engage in a discussion of" the R.C. 2151.414(E)(7) through (11) factors.

The factors in R.C. 2151.414(E)(7) through (11), which are referred to in R.C. 2151.414(D)(1)(e), involve a parent's having been convicted of or pleaded guilty to specific criminal offenses against the child, the child's sibling or another child who lived in the parent's household; a parent's withholding medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated.

*A.M.* at ¶ 19.

**{¶49}** In the case before us, the trial court's judgment entry recites all of the best interest factors listed in R.C. 2151.414(D)(1), including the R.C. 2151.414(E)(7) through (11) factors contained in R.C. 2151.414(D)(1)(e).  The lack of specific findings regarding those factors is not a fatal flaw.  Instead, the statute "requires only that the court *consider* those factors."  (Emphasis in original.)  *Id.* at ¶ 42.

**{¶50}** Here, the record indicates that the trial court considered all of the best interest factors, including R.C. 2151.414(D)(1)(e).  Nothing required the court to engage in a discussion of each of the circumstances listed in R.C. 2151.414(E)(7) through (11).  Consequently, we do not agree with appellant that the trial court's failure to discuss each R.C. 2151.414(E)(7) through (11) factor means that the court prejudicially erred.

**{¶51}** Based upon all of the foregoing reasons, the trial court could have firmly believed that placing the children in the agency's permanent custody is in their best interests.  Therefore, we do not agree with appellant the trial court's judgment granting the agency permanent custody is against the manifest weight of the evidence.

**{¶52}** Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

ASSIGNMENT OF ERROR II

**{¶53}**  In her second assignment of error, appellant argues that the trial court plainly erred by failing to discharge the guardian ad litem and appoint a new one. Appellant claims that R.C. 2151.281(D) required the trial court to discharge the GAL because the GAL failed to comply with all of the duties listed in Sup.R. 48.03(D).

**{¶54}** The agency asserts that appellant failed to object to the GAL's alleged noncompliance during the trial court proceedings and that she, thus, forfeited all but plain error.  The agency contends that even if error occurred, appellant cannot establish that the outcome of the proceeding would have been different.

**{¶55}** A well-established rule of appellate procedure is that " 'an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court.' "  *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 15, quoting *State v. Childs*, 14 Ohio St.2d 56, 236 N.E.2d 545 (1968), paragraph three of the syllabus. The failure to object to an error at a time when the court could have avoided or corrected the error means that the appellant forfeits the right to raise the issue on appeal.  *Independence v. Office of the Cuyahoga Cty. Executive*, 142 Ohio St.3d 125, 2014-Ohio-4650, 28 N.E.3d 1182, ¶ 30 (stating that "an appellant generally may not raise an argument on appeal that the appellant has not raised in the lower courts"); *Quarterman* at ¶ 21 (explaining that defendant forfeited his constitutional challenge by failing to raise it during trial court proceedings); *Gibson v. Meadow Gold Dairy*, 88 Ohio St.3d 201, 204, 724 N.E.2d 787 (2000) (concluding that party waived arguments for

purposes of appeal when that party failed to raise those arguments during the trial court proceedings); *State ex rel. Gutierrez v. Trumbull Cty. Bd. of Elections*, 65 Ohio St.3d 175, 177, 602 N.E.2d 622 (1992) (explaining that an appellant cannot "present * * * new arguments for the first time on appeal"); *accord State ex rel. Jeffers v. Athens Cty. Commrs.*, 4th Dist. Athens No. 15CA27, 2016-Ohio-8119, ¶ 27, fn.3 (stating that "[i]t is well-settled that failure to raise an argument in the trial court results in waiver of the argument for purposes of appeal"); *State v. Anderson*, 4th Dist. Washington No. 15CA28, 2016-Ohio-2704, ¶ 24 (explaining that "arguments not presented in the trial court are deemed to be waived and may not be raised for the first time on appeal").

{¶56} Appellate courts nevertheless have discretion to consider forfeited errors and review them for plain error. *Quarterman* at ¶ 16; *State v. Pyles*, 7th Dist. Mahoning No. 13-MA-22, 2015-Ohio-5594, ¶ 82, quoting *State v. Jones*, 7th Dist. Mahoning No. 06-MA-109, 2008-Ohio-1541, ¶ 65 (explaining that the plain error doctrine " 'is a wholly discretionary doctrine' "); *DeVan v. Cuyahoga Cty. Bd. of Revision*, 2015-Ohio-4279, 45 N.E.3d 661, ¶ 9 (8th Dist.) (noting that appellate courts retain discretion to consider forfeited arguments). For the plain error doctrine to apply, the party claiming error must establish (1) that " 'an error, i.e., a deviation from a legal rule' " occurred, (2) that the error was " 'an "obvious" defect in the trial proceedings,' " and (3) that this obvious error affected substantial rights, i.e., the error " 'must have affected the outcome of the trial.' " *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002); *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209, 436 N.E.2d 1001 (1982) ("A 'plain error' is obvious and prejudicial although neither objected to nor affirmatively

waived which, if permitted, would have a material adverse [e]ffect on the character and public confidence in judicial proceedings.").

**{¶57}** The plain error doctrine is not, however, readily invoked in civil cases. Instead, an appellate court "must proceed with the utmost caution" when applying the plain error doctrine in civil cases. *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1997). The Ohio Supreme Court has set a "very high standard" for invoking the plain error doctrine in a civil case. *Perez v. Falls Financial, Inc.*, 87 Ohio St.3d 371, 721 N.E.2d 47 (2000). Thus, "the doctrine is sharply limited to the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss*, 79 Ohio St.3d at 122; *accord Gable v. Gates Mills*, 103 Ohio St.3d 449, 2004-Ohio-5719, 816 N.E.2d 1049, ¶ 43. Moreover, appellate courts " 'should be hesitant to decide [forfeited errors] for the reason that justice is far better served when it has the benefit of briefing, arguing, and lower court consideration before making a final determination.' " *Risner v. Ohio Dept. of Nat. Resources, Ohio Div. of Wildlife*, 144 Ohio St.3d 278, 2015-Ohio-3731, 42 N.E.3d 718, ¶ 28, quoting *Sizemore v. Smith*, 6 Ohio St.3d 330, 332, 453 N.E.2d 632 (1983), fn. 2; *accord Mark v. Mellott Mfg. Co., Inc.*, 106 Ohio App.3d 571, 589, 666 N.E.2d 631 (4th Dist.1995) ("Litigants must not be permitted to hold their arguments in reserve for appeal, thus evading the trial court process.").

**{¶58}** Additionally, "[t]he plain error doctrine should never be applied to reverse a civil judgment * * * to allow litigation of issues which could easily have been raised and

determined in the initial trial." *Goldfuss*, 79 Ohio St.3d at 122.  Instead, " 'the idea that parties must bear the cost of their own mistakes at trial is a central presupposition of our adversarial system of justice.' " *Id.* at 121, 679 N.E.2d 1099, quoting *Montalvo v. Lapez*, 77 Haw. 282, 305, 884 P.2d 345 (1994) (Nakayama, J., concurring in part and dissenting in part).

{¶59} In the case at bar, appellant did not object to the GAL's alleged noncompliance with Sup.R. 48.03(D) at a time when the trial court could have corrected any error.  Therefore, appellant forfeited the right to raise the issue on appeal.  *In re E.A.G.*, 4th Dist. Washington No. 23CA7, 2024-Ohio-315, ¶ 80; s*ee In re B.S.*, 8th Dist. Cuyahoga No. 113014, 2023-Ohio-4548, ¶ 39 (a GAL's failure to submit a written report before a permanent custody hearing "is waived unless raised at the trial-court level").  Moreover, as we explain below, any error that may have occurred did not affect the outcome of the proceedings.

{¶60} A GAL's primary duty in a permanent custody proceeding is "to protect the interest of the child." R.C. 2151.281(B)(1); *accord In re C.B.*, 129 Ohio St.3d 231, 2011-Ohio-2899, 951 N.E.2d 398, ¶ 14 (a GAL's "purpose is to protect the interest of the child").  The GAL must "perform whatever functions are necessary to protect the best interest of the child, including, but not limited to, investigation, mediation, monitoring court proceedings, and monitoring the services" that the agency provided the child, "and shall file any motions and other court papers that are in the best interest of the child." R.C. 2151.281(I).  If the GAL fails "to faithfully discharge the guardian ad litem's duties," the court "shall discharge the guardian ad litem and appoint another guardian ad litem." R.C. 2151.281(D).

{¶61} Additionally, Sup.R. 48.03(D) contains a nonexhaustive listing of a GAL's duties:

> (1) Become informed about the facts of the case and contact all relevant persons;
> (2) Observe the child with each parent, foster parent, guardian or physical custodian;
> (3) Interview the child, if age and developmentally appropriate, where no parent, foster parent, guardian, or physical custodian is present;
> (4) Visit the child at the residence or proposed residence of the child in accordance with any standards established by the court;
> (5) Ascertain the wishes and concerns of the child;
> (6) Interview the parties, foster parents, guardians, physical custodian, and other significant individuals who may have relevant knowledge regarding the issues of the case. The guardian ad litem may require each individual to be interviewed without the presence of others. Upon request of the individual, the attorney for the individual may be present.
> (7) Interview relevant school personnel, medical and mental health providers, child protective services workers, and court personnel and obtain copies of relevant records;
> (8) Review pleadings and other relevant court documents in the case;
> (9) Obtain and review relevant criminal, civil, educational, mental health, medical, and administrative records pertaining to the child and, if appropriate, the family of the child or other parties in the case;
> (10) Request that the court order psychological evaluations, mental health substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court;
> (11) Review any necessary information and interview other persons as necessary to make an informed recommendation regarding the best interest of the child.

{¶62} Appellant asserts that the GAL failed to comply with Sup.R. 48.03(D) in the following respects: (1) the GAL "repeatedly failed to contact Appellant and the prior caseworkers" (Sup.R. 48.03(D)(1)); (2) "[t]he GAL failed to confirm that no one was present when he interviewed the children" (Sup.R. 48.03(D)(3)); (3) upon appellant's release from prison, "the GAL failed to contact Appellant to confirm her residence" (Sup.R. 48.03(D)(4)); (4) "[t]he GAL did not interview Appellant or the previous two case

workers" (Sup.R. 48.03(D)(6)); (5) the GAL did not interview "relevant school personnel or medical or mental health providers," or obtain "relevant records of the children or parents" (Sup.R. 48.03(D)(7)).

**{¶63}** However, even if appellant's assertions are correct, this court, along with other Ohio appellate courts, has refused to recognize purported Sup.R. 48.03(D) violations as reversible error. *In re A.A.*, 10th Dist. Franklin No. 23AP-152, 2024-Ohio-224, ¶ 50; *In re S.W.*, 2023-Ohio-793, 210 N.E.3d 36, ¶ 45 (4th Dist.); *see In re K.L.*, 11th Dist. Portage No. 2021-P-0022, 2021-Ohio-3080, ¶ 63 ("the failure to comply with the Rules of Superintendence, even if a technical error, is not reversible"); *In re E.W.*, 4th Dist. Washington No. 10CA18, 2011-Ohio-2123, ¶ 12 (superintendence rules are internal housekeeping rules that do not create any substantive rights); *Pettit v. Pettit*, 12th Dist. Fayette No. CA2011-08-018, 2012-Ohio-1801, ¶ 12 (superintendence rules are "administrative directives only, and are not intended to function as rules of practice and procedure"); *see State ex rel. Parker Bey v. Byrd*, 160 Ohio St.3d 141, 2020-Ohio-2766, 154 N.E.3d 57, ¶ 41, quoting *State v. Singer*, 50 Ohio St.2d 103, 110, 362 N.E.2d 1216 (1977) (" '[t]he Rules of Superintendence are not designed to alter basic substantive rights' ") (Kennedy, J., concurring in part and dissenting in part).  Therefore, even if the GAL failed to comply with some of the duties listed in Sup.R. 48.03(D), the failure to comply with this superintendence rule does not constitute reversible error.

**{¶64}** Additionally, appellant has not argued that any purported failures to comply with Sup.R. 48.03(D) affected the outcome of the proceedings.  Rather, she simply contends that the trial court should have discharged the GAL and appointed a new one. Appellant does not claim that appointing a new GAL would have caused the trial court to

deny the agency's request for permanent custody of the children. Consequently, appellant cannot establish that this case is one of the extremely rare cases "involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss*, 79 Ohio St.3d at 122.

{¶65} Accordingly, we overrule appellant's second assignment of error.

CONCLUSION

{¶66} Having overruled appellant's two assignments of error, we affirm the trial court's judgment.

**JUDGMENT AFFIRMED.**

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Hocking County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. and Abele, J.:  Concur in Judgment and Opinion.

For the Court,


BY: _____
Kristy S. Wilkin, Judge




**NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**